# Richmond

## CITY OF PORTSMOUTH v. VERNON M. CULPEPPER.

May 7, 1951.

Record No. 3772.

Present, All the Justices.

The opinion states the case.

*James G. Martin & Sons, R. C. Barclay* and *A. A. Bangel,* for the plaintiff in error.

*William G. Maupin* and *Major M. Hillard,* for the defendant in error.

WHITTLE, J., delivered the opinion of the court.

This action was filed in the Circuit Court of Norfolk county against the City of Portsmouth by Vernon M. Culpepper, who claimed that the city had flooded his lands and damaged or destroyed the crops on his truck farm. The damage is alleged to have occurred in the spring or early summer of 1948. A verdict for Culpepper in the sum of $7,500 resulted, and to the judgment entered on this verdict, on May 6, 1950, the city was granted a writ of error by this court.

The basis of Culpepper's suit was, that the city maintained and controlled what is known as the Portsmouth Canal or Ditch, which is an artificial waterway originally twenty-six feet wide, eleven feet deep and eleven miles in length. This canal was designed to take the water from Lake Drummond northwardly toward the city of Portsmouth where it might be used in supplementing the city's water supply.

Several canals and ditches lying in the vicinity of the Culpepper farm appear prominently in the record in this case. On June 17, 1926, this court decided the case of *Portsmouth* v. *Weiss,* 145 Va. 94, 133 S. E. 781. That case deals with practically the same location as is involved in the instant case, and Judge Burks in his opinion very fully covers the geography of the territory here under consideration. The opinion describes at length the various canals and ditches appearing in the record now being considered, and therefore, we see no necessity for again describing them.

In this case we are mainly concerned with the Portsmouth Canal or Ditch.

Culpepper contends that many years ago the city had a dam placed across the Portsmouth Canal to facilitate the collection of water, which dam remained in place until the year 1922, when it was washed away by heavy rains. The city attempted to repair this washout and remedy the loss by the erection of an

earthen dam across the canal. In the building of the dam, dirt was obtained from the east side or bank of the canal. The removal of this dirt cut down and lowered the eastern side of the canal to normal ground level, for a space of approximately one hundred yards. Before the dam across the canal could be completed the city was enjoined from proceeding further with the work, unless and until an adequate spillway was provided around the west side thereof. The city refused to build the spillway and abandoned the idea of completing the dam. The incompleted dam was allowed to remain in the canal, and trees and brush were suffered to grow thereon, all of which tended to obstruct the natural flow of water.

In the spring of 1948 Culpepper had planted his crops on land lying approximately a mile east of the Portsmouth Canal. The land employed in the growing of these crops apparently was adequately drained and ditched. The soil is of a loamy, porous texture and is not subject to crop damage by reason of rain water. The maps, pictures and evidence introduced in the case show the land between the Portsmouth Canal and the Culpepper farm to be practically level.

Extremely heavy rains fell in late May and early June 1948. The Portsmouth Canal was filled with water, which was flowing swiftly northward. Culpepper contends that this water, so collected, was obstructed in its flow, by the dam and the growth of trees and bushes thereon, and overflowed the eastern side of the canal, at the point where the city had lowered the eastern bank, flooded his crops and caused the damage of which he complains.

The City of Portsmouth filed its plea of the general issue in the case and also filed a special plea of the statute of limitations, which was rejected by the trial court, to which ruling the city excepted.

The case was vigorously defended by the city on the theory that there was no obstruction in the canal and that the rainfall was so severe it amounted to flood. Evidence was introduced to show that this rain was the heaviest downpour on record. The city contended that ''the testimony of H. D. Hustead of the Weather Bureau showed that the rainfall causing the flood was plainly an Act of God, in excess of anything shown since the Weather Bureau was created in 1879''. Further, the city contends that there is no trustworthy evidence to show that any of

the water which covered Culpepper's crops came from the Portsmouth Canal.

With these contentions we cannot agree. There is ample evidence in the record to show that the city permitted this unfinished earthen dam to remain in the canal and that it suffered trees, bushes and weeds to grow over it to such an extent that the flow of water was necessarily obstructed.

Undoubtedly the record shows that the rainfall in question was extremely severe, but under the circumstances and facts in this case, it cannot be termed an "Act of God". It has been held in Virginia since 1849 that "all human agency is to be excluded from creating or entering into the cause of mischief, in order that it may be deemed an Act of God." See *Friend* v. *Woods,* 6 Gratt. (47 Va.) 189, 190-195, 52 Am. Dec. 119.

In 1 Bouvier's Law Dictionary, Rawle's Third Edition, at Page 116, "Act of God" is defined, as follows: "Any accident due to natural causes directly and exclusively without human intervention, such as could not have been prevented by any amount of foresight and pains, and care reasonably to have been expected".

The jury had a right to conclude that this canal had been obstructed by the city, that the city had permitted the nuisance to stand unabated, and that the city had also lowered the bank on the east side of the canal which would permit water to overflow the bank at this point.

This record also has abundant evidence to carry the case to the jury on the question, whether or not the water from the Portsmouth Canal overflowed Culpepper's crops and caused the damage. While there are several witnesses who testify on this subject, a reading of the evidence of S. W. Armstead, a civil engineer, of thirty years' experience, is ample to submit the question to the jury. He testified that, if water flowed over the east bank of the canal at the lowered point, waist deep, for 24 hours, it would be bound to overflow the Culpepper land. It was established that the water did so flow.

There are eleven assignments of error contained in the record and stressed in the city's brief.

Assignment No. 1 deals with the court's action in striking out the plea of the five year statute of limitations. This assignment was abandoned in oral argument.

Assignment No. 2 deals with a statement made by Culpepper

while on the stand, to the effect that, ''While we were standing there Mr. Ancell asked Mr. Bergeron 'what would we do, leave the canal like it is and be liable to suit or do something about it?' ''

Mr. Ancell was the City Manager of the city of Portsmouth, and Mr. Bergeron was the City Engineer. Culpepper had gone to City Hall in an effort to get these men to come to the scene and look the situation over. He wanted them to come at once while the damage to his crops was being inflicted. They could not or would not go with him on the day he made the request but did come out to the farm the following day, and even at that time they were evidently impressed. These two men were important officials of the city. The term, City Manager, means what it says. This official does, to all intent and purpose, manage the city. He makes his recommendations to the Council, and they act on the recommendations, but in this instance he was simply asking his engineer a question— ''What would we do, leave the canal like it is and be liable for suits, or do something about it?'' He does not here offer to pay damages, and in no way attempts to bind the city. There is no merit in this assignment.

Assignment No. 3 deals with the court's allowing in evidence the testimony of O. L. Weiss as to the injunction case brought by him against the city, and permitting the introduction of Exhibits 16 and 17, which were respectively a preliminary injunction order and a permanent injunction order awarded by the Circuit Court of Norfolk county, entered respectively on April 2, 1923, and August 6, 1926, forbidding the city from further proceeding to repair the dam, and authorizing it to maintain a dam across the canal only upon condition that a proper spillway be provided.

The city of Portsmouth was here defending this case upon the ground, among others, that there was no obstruction in the canal and this evidence was admissible to show that the obstruction was there and that the city knew it to be there. The basis of this action is not negligence. Culpepper complains of a positive, affirmative wrong done by the city, a trespass on his property, a private nuisance. See *Portsmouth* v. *Weiss,* supra, page 108. This evidence was admissible for the purpose of showing the existence of the nuisance.

Assignment No. 4 challenges the court's ruling on evidence admitted on cross-examination of the City Engineer as to

what the city had done to correct the situation since the "flood" in question. A reading of the record does not disclose this to be error. The record discloses that the city had introduced evidence dealing with overflows in 1949, between the time of the damage here sued for and the time of the trial. The city had introduced its engineer, Bergeron, and other witnesses to ask what became of the water which overflowed the bank of the canal. It was attempting to show that the damage to Culpepper in 1948 was due to improper ditching of his farm and not to the overflow from the canal. Bergeron had previously testified that the canal had again overflowed its banks in 1949. He was then asked if the city had done anything to remedy the trouble, and he said, "No", but he continued and said that the matter had never been brought up by any city authority. It is clearly shown that the City Engineer knew that this ditch had overflowed its banks on two recent occasions and it was reasonable to ask, on cross-examination, what remedial steps had been taken to correct the trouble. The witness was offered by the city in the hope that the jury would believe what he said; the city desired him to appear as a witness worthy of belief and on the other hand, Culpepper desired to discredit him as a reasonable witness, by showing that certainly he should have done something to remedy the difficulty about which he was testifying, to-wit, the continuous overflowing of the canal.

Assignment No. 5 deals with the court's failure to declare a mistrial when J. T. Bergeron, Portsmouth City Engineer, and a witness for the city in this case, was called on re-direct examination. The city was trying to have him say that when Weiss sued the city in 1922, that the water then complained of came from the Richmond Cedar Works Canal rather than the Portsmouth Canal, and he went so far as to say that he understood the damage came from the Richmond Cedar Works Canal. On cross-examination he was asked this question, "Upon whom did Mr. Weiss put the responsibility for that overflow; the Richmond Cedar Works Ditch or City of Portsmouth?" This trained official for the city, instead of answering the question, replied, "He sued the City of Portsmouth". Whereupon the city moved the Court to strike the answer and declare a mistrial. The Court did strike the answer but refused to declare a mistrial. Weiss had theretofore testified that he and others had obtained

the injunction order against the city, and Bergeron was simply re-stating what Weiss had already testified to, without objection.

Assignment No. 6 is closely related to No. 5, and there is no point in the exception. Weiss had already testified for Culpepper, and he had been carefully cross-examined by the city. Two days later he was recalled by the city. Counsel for the city tried to have its engineer, Bergeron, state that the water which damaged Weiss in 1922 came from the Richmond Cedar Works Ditch. Bergeron had testified to that effect, and in order to contradict him, counsel for Culpepper showed by Weiss that he held the city responsible for the water damage in 1922, and had not stressed a claim against Richmond Cedar Works. Plainly under the development of the city's defense, this evidence was proper.

Assignment No. 7 complains of the court's refusal to admit two exhibits, X and Y, offered by the city. The petition fails to disclose the circumstances of objection, but the record shows that the admission of the exhibits was objected to for the reason that they were photographs of the Dismal Swamp Canal with water running over the spillway, which were admittedly taken more than a year after the flood which is the basis of this action. Counsel for the city admits that the exhibits "do not pretend to show the condition the day we are speaking of in '48". Whereupon counsel for Culpepper replied, "I have no objection to the picture of the locks *per se,* but I have serious objections to showing water pouring through the locks, and that sort of thing, because we don't know whether that approximates the condition in June, '48 or not". The objection was properly sustained, and certainly the city was not harmed thereby for there were numerous pictures of the same general character introduced as exhibits.

Assignment No. 8 deals with the court's refusal to permit Assistant Engineer, L. G. Brandt, to answer a hypothetical question propounded to him by counsel for the city. This question was properly ruled out by the court: It did not meet the requirements of a hypothetical question; was not based upon the evidence in the case, and it was incomplete in that it did not take into consideration all of the factors which were necessary for an intelligent answer. The witness admitted that he could not answer the question correctly without actual observation at the time, and this was obviously impossible.

Assignment No. 9 complains of the action of the trial court

in granting instructions A and B offered on behalf of Culpepper. While counsel for the city states in its brief, "We submit that there was not sufficient evidence to permit any instructions for plaintiff", in oral argument this assignment of error was abandoned.

Assignment No. 10 complains of the action of the trial court in refusing three instructions offered by counsel on behalf of the city, and while this assignment occupies much space in the city's brief, it was abandoned in oral argument.

Assignment No. 11. This assignment of error, which is the final one, complains of the refusal of the court below to strike out the evidence because it was not sufficient to support a verdict, and because the verdict was contrary to the law and the evidence.

The case was well tried by able attorneys before an able judge. The facts, as disclosed by the record, show a proper case for submission to a jury, under proper instructions. Admittedly there are no errors in the instructions. The evidence of course is in conflict. The city says that there was no obstruction in the Portsmouth Canal, that the damage was caused by a flood which was an Act of God, that there is no evidence to show that the water from the Portsmouth Canal ever reached the Culpepper land, etc., etc. If the jury believed the evidence introduced by the city in support of these contentions, then, under the court's instructions, its verdict would have been for the city.

On the other hand Culpepper contends that the city maintained this canal and suffered it to remain with a dam across it, reaching within two and one-half feet of the top of the banks; that trees and bushes were permitted to grow thereon; that the flow of water in the ditch was necessarily obstructed, that the east bank of the canal had been removed by the city for a distance of one hundred yards, cutting the bank down to near ground level, that when the rain or flood came in late May and early June, 1948, the waters thereof were impounded in the city's canal, and that the obstruction therein located caused the waters, thus collected, to flow from the lowered banks of the canal in great force and to spread over and completely cover and destroy the crops. If the jury believed the evidence of Culpepper's witnesses, introduced in support of these contentions, then, under the court's instructions, its verdict should have been, as it was in this case, for Culpepper.

The judgment of the trial court is affirmed.

*Affirmed.*