Present: All the Justices

GEOFF LIVINGSTON, ET AL.

OPINION BY
JUSTICE LEROY F. MILLETTE, JR.
June 7, 2012

v.    Record No. 101006

VIRGINIA DEPARTMENT OF
TRANSPORTATION

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Robert J. Smith, Judge

Geoff Livingston and 134 other homeowners or renters (collectively Plaintiffs) in Fairfax County's (County) Huntington subdivision brought this inverse condemnation suit against the County and the Virginia Department of Transportation (VDOT) after their homes were flooded during a severe storm in the summer of 2006. The circuit court dismissed the suit on demurrer, holding in relevant part that a single occurrence of flooding cannot support an inverse condemnation claim under Article I, Section 11 of the Constitution of Virginia. We disagree and reverse.

I.

A.

Because this case arises from a demurrer, we recite the facts as they are alleged in the Plaintiffs' second amended complaint. Station #2, LLC v. Lynch, 280 Va. 166, 169, 695 S.E.2d 537, 539 (2010). On June 25, 2006, the Plaintiffs were homeowners or renters in Huntington, which is located along the southern bank of Cameron Run, a tributary stream of the Potomac

River, near the County's border with the City of Alexandria. That evening, a storm produced "long periods of precipitation with high intensity downpours," causing significant flooding. In less than two hours, the flow depth of Cameron Run increased from just under 2 feet to almost 14 feet. The storm created the second-highest water flow in the channel since 1953.[1]

The floodwaters, blocked on the north by the concrete mass of the Capital Beltway, overwhelmed the southern bank of Cameron Run and engulfed much of Huntington. Floodwater backed up through storm and sanitary sewers and filled the basements of many of the Plaintiffs' homes with sewage-laced water. The flood damaged the Plaintiffs' homes and personal property.

The Plaintiffs allege that the June 2006 flood was caused by the acts or omissions of the County and VDOT. During its construction of the Beltway in the early 1960s, VDOT's predecessor, the Virginia Department of Highways, straightened a curved section of Cameron Run and relocated it roughly 1,150 feet closer to Huntington.[2] The straightening and relocation reduced Cameron Run to 38% of its natural width.

---

[1] The highest flow was created by Hurricane Agnes in 1972.

[2] From the time of the Beltway's construction until the June 2006 flood, VDOT owned the land on which Cameron Run was relocated. The Huntington homes were built several years before the relocation of Cameron Run and construction of the Beltway.

VDOT built the Beltway to the immediate north of the relocated Cameron Run. To create a base for the Beltway in what had been a marsh and wetlands, VDOT removed the natural "sponge" for floodwater by adding solid fill and draining the remaining water with vertical "sand wicks." The presence of the Beltway on the northern edge of the relocated Cameron Run also created a berm, which forced water south during flooding and "eliminat[ed] the conveyance potential beyond the north bank of the stream."

The Plaintiffs allege that their homes would not have flooded in 2006 had VDOT not, in the early 1960s, relocated Cameron Run, filled in portions of the watershed marshes to construct the Beltway, narrowed the channel's natural width, and built the Beltway in such a way as to serve as a concrete wall blocking any northern flow of water from the channel.

The Plaintiffs further allege that the flood damage was "amplified" by the County's and VDOT's acts or omissions after the relocation of Cameron Run and construction of the Beltway. They allege that most of their homes would not have flooded at all, and those few that did would have suffered only minor damage, if the elevation of the June 2006 flood had not been significantly raised by the accumulation of sediment in the relocated Cameron Run due to the County's and VDOT's failure to dredge or otherwise maintain the channel, VDOT's construction

3

of the U.S. Route 1 Interchange in the Cameron Run Watershed, and the encroachment on the Cameron Run flood plain caused by commercial and other development approved by the County.

According to a 2007 report prepared by the Army Corps of Engineers, 5 to 6 feet of sediment accumulated in the relocated Cameron Run between 1965 and 1999. This sedimentation contributed to the severity of the June 2006 flood, decreasing the capacity of the channel to transport water to the Potomac River and away from Huntington. The Corps report concluded that without such sedimentation, flood elevations in Huntington would have been 1.2 to 2 feet lower. The County and VDOT were aware, by way of multiple reports and memoranda, of the sedimentation and the increased risk of flooding it posed, but did not undertake any dredging or maintenance of the relocated Cameron Run. As early as 1966, the County adopted an ordinance for a regulated 100-year floodplain for the channel. In 1970, VDOT's resident engineer circulated a memorandum in which he acknowledged the danger of sedimentation in the relocated Cameron Run but disavowed VDOT's responsibility for dredging it. In the wake of the June 2006 flood, VDOT continued to insist that it had no duty to maintain the channel. Rather, VDOT asserted, "each locality is responsible for the maintenance of the natural and relocated Cameron Run Channel

4

within its jurisdictional limits, despite the fact that the subject reach of Cameron Run is within VDOT's [r]ight-of-way."

The Corps report also found that the construction of the Route 1 Interchange, part of the Woodrow Wilson Bridge construction project, contributed up to 1 foot to the water level during the June 2006 flood and that commercial development within the Cameron Run floodplain contributed another 2.5 to 5 inches.  Such development included the Huntington Metro Rail and Station, completed in 1983, and Jones Point, a 100-acre development located adjacent to Cameron Run containing residential apartment towers and several commercial buildings.  A metal retaining wall was constructed along Cameron Run for Jones Point, with a large amount of fill brought in to elevate that development out of the floodplain.

B.

To recover for the damage to their homes and personal property resulting from the June 2006 flood, the Plaintiffs sued the County and VDOT.  In their second amended complaint, the Plaintiffs allege that the County and VDOT damaged their homes and personal property for public use without just compensation, in violation of Article I, Section 11 of the Constitution of Virginia.  That section, in relevant part, guarantees "that the General Assembly shall not pass any law . . . whereby private property shall be taken or damaged for

5

public uses, without just compensation."  Va. Const. Art. I, § 11.

Both the County and VDOT demurred.  VDOT's demurrer presented several grounds for dismissal:  that the Plaintiffs lacked standing because they did not own or rent their homes when VDOT relocated Cameron Run and built the Beltway;[3] that the Plaintiffs failed to identify or allege a specific appurtenant right connected to their homes that VDOT damaged when it constructed the Beltway; that VDOT was not responsible for commercial development in the Cameron Run Watershed, including the construction of the Huntington Metro and Jones Point; that the Plaintiffs' homes were not damaged for public use; and that the Plaintiffs could not recover for damage to their personal property.

The circuit court sustained the County's and VDOT's demurrers.  In its letter opinion, the circuit court framed the question presented — which it considered to be one of first impression — as follows:  "[D]oes a single occurrence of temporary flooding state a cause of action for inverse condemnation?"  To answer this question, the circuit court analyzed several of our cases involving multiple occurrences of

---

[3] VDOT also raised this issue as a plea in bar of the statute of limitations, which was pending when the circuit court sustained the demurrers; hence it is not a part of this appeal.

6

flooding as well as several federal cases construing the Takings Clause of the Federal Constitution in a flooding context. It reasoned that

> the distinction between taking and damaging is [not] dispositive. As I understand the law, the distinction that is dispositive is the episodic nature of the event — not the legal terminology that describes the result of the event. An allegation of a one[-]time event that results in a taking is no more compensable than a one[-]time event that results only in damage.

Concluding that the June 2006 flood was "an extraordinary event," the circuit court went on to hold that "a one[-]time episode of flooding does not state a cause of action for inverse condemnation" under Article I, Section 11.[4] It accordingly dismissed the Plaintiffs' second amended complaint with prejudice.

C.

We granted the Plaintiffs' petition for appeal as to VDOT but not as to the County. The Plaintiffs assign error as follows:

> The trial court erred in sustaining [VDOT's] demurrer[] when it concluded that a single occurrence of flooding cannot state a cause of action for damaging under Article I, [Section] 11 of the Constitution of Virginia.

(Internal quotation marks omitted.)

---

[4] The circuit court also sustained the County's demurrer on the ground that the County "did nothing more than acquiesce in the construction of the Beltway." The Plaintiffs did not challenge this ruling.

7

We also granted VDOT's assignments of cross-error, which state:

1. The trial court erred in not sustaining VDOT's Demurrer on the alternative grounds that [the Plaintiffs] lacked standing to seek compensation under Article I, Section 11 of the Virginia Constitution because they did not own or rent the subject properties when the Beltway was constructed.

2. The trial court erred in not sustaining VDOT's Demurrer on the alternative grounds that [VDOT] was not responsible for the dramatic urbanization of the Cameron Run Watershed after the Beltway was completed more than 50 years ago.

3. The trial court erred in not sustaining VDOT's Demurrer on the alternative grounds [that the Plaintiffs] did not allege that their property was damaged "for a public use."

4. The trial court erred in not sustaining VDOT's Demurrer on the alternative grounds that [the Plaintiffs] cannot recover for damages to personal property, business losses or repair costs in an inverse condemnation action.

(Some internal quotation marks omitted.)

## II.

We review de novo the circuit court's sustaining of VDOT's demurrer. Lee v. City of Norfolk, 281 Va. 423, 432, 706 S.E.2d 330, 334 (2011). In conducting our review, we accept as true the facts alleged in the Plaintiffs' second amended complaint and give the Plaintiffs the benefit of all reasonable inferences that may be drawn from those facts. Station #2, 280 Va. at 169, 695 S.E.2d at 539. This is because "[a] demurrer

8

tests the legal sufficiency of facts alleged in pleadings, not the strength of proof." Lee, 281 Va. at 432, 706 S.E.2d at 334 (quoting Augusta Mutual Insurance Co. v. Mason, 274 Va. 199, 204, 645 S.E.2d 290, 293 (2007)). "To survive a challenge by demurrer, a pleading must be made with 'sufficient definiteness to enable the court to find the existence of a legal basis for its judgment.' " Hubbard v. Dresser, Inc., 271 Va. 117, 122, 624 S.E.2d 1, 4 (2006) (quoting Moore v. Jefferson Hospital, Inc., 208 Va. 438, 440, 158 S.E.2d 124, 126 (1967)).

### III.

### A.

Article I, Section 11 of the Constitution of Virginia confers upon a property owner a right to just compensation if the government takes or damages his property for public use. A property owner may enforce this constitutional right through an inverse condemnation suit. Kitchen v. City of Newport News, 275 Va. 378, 386, 657 S.E.2d 132, 136 (2008). For the government to take or damage property within the meaning of Article I, Section 11, it need not "actually invade or disturb the property"; rather, it need only "adversely affect[] the [property owner's] ability to exercise a right connected to the property." Id. (quoting Richmeade, L.P. v. City of Richmond, 267 Va. 598, 602, 594 S.E.2d 606, 609 (2004)). A suit for inverse condemnation, then, "is an action seeking redress for

9

the government's action in limiting property rights the [property owner] holds." Id. at 386, 657 S.E.2d at 136-37 (quoting Richmeade, 267 Va. at 603, 594 S.E.2d at 609).

B.

The Plaintiffs assert that the circuit court erred by holding that a single occurrence of flooding cannot support an inverse condemnation claim. They contend that a taking and a damaging are distinct concepts under Article I, Section 11; and that, accordingly, "[p]roperty can be taken without being damaged, and property can be damaged without being taken." So, they argue, "while the injury caused by a one-time event is not compensable as a taking, it is compensable as a damaging."

VDOT does not dispute that a single occurrence of flooding could give rise to a compensable damaging under Article I, Section 11, but it has a different view of the circuit court's holding. According to VDOT, the circuit court did not hold that a single occurrence of flooding could never support an inverse condemnation claim; instead, it held that the June 2006 flood could not support the Plaintiffs' inverse condemnation claim because it was "an extraordinary event."

In support of its reading of the circuit court's holding, VDOT points to the court's reliance on our decision in American Locomotive Company v. Hoffman, 105 Va. 343, 54 S.E. 25 (1906). There we considered whether a railroad was liable for damages

10

to a property owner for building two culverts that were allegedly inadequate to "carry off" the water from a nearby stream. Id. at 344-45, 54 S.E.2d at 25-26. The property owner claimed that the improper design and construction of the culverts led to multiple "overflows" onto his property. Id. In addressing the rights and obligations of riparian owners, we said:

> Where bridges, culverts, etc., are constructed across water courses by railroad companies, municipalities, or other corporations, or by individuals, due care must be taken not to obstruct the natural flow, including that at seasons of either low or usual high water, and the failure to do so will render the offender liable for injuries to landowners caused by the penning back of the waters and the overflow of their lands; but such structures need not be constructed in such a manner as to permit the unobstructed flow of the water course in times of <u>unprecedented and extraordinary freshets</u>.

Id. at 350, 54 S.E.2d at 27 (emphasis added) (internal quotation marks and citation omitted). The circuit court quoted this language in its letter opinion just before announcing its holding.

To the extent that the circuit court held that a single occurrence of flooding cannot support an inverse condemnation claim, it erred. We find nothing in Article I, Section 11's text or history that limits a property owner's right to just compensation for a damaging to only multiple occurrences of flooding. Further, our case law holds that a single occurrence

11

of flooding can support an inverse condemnation claim. In Hampton Roads Sanitation District v. McDonnell, 234 Va. 235, 360 S.E.2d 841 (1987), we said that a property owner could bring a new inverse condemnation suit against the City of Hampton Roads each time it discharged sewage onto his property. Id. at 239, 360 S.E.2d at 844. We explained: "[T]he original discharge of sewage in 1969 did not produce all the damage to the property. The discharges were not continuous; instead, they occurred only at intervals. Thus, each discharge inflicted a new injury for which [the property owner] had a separate cause of action." Id. (emphasis added).

The circuit court also erred insofar as it held that the June 2006 flood could not support the Plaintiffs' inverse condemnation claim because it was "an extraordinary event." We have said that "[w]hether an extraordinary flood is an 'act of God' is a mixed question of law and fact" and that the defendant bears the burden of "prov[ing] the existence of circumstances permitting exemption from liability." Cooper v. Horn, 248 Va. 417, 425, 448 S.E.2d 403, 407 (1994). But we have never addressed whether damages caused by an act of God are compensable under Article I, Section 11. Other States with similar constitutional provisions have held that such damages do not give rise to an inverse condemnation claim. See, e.g., Schrader v. State, 213 N.W.2d 539, 543-44 (Iowa 1973) (holding

12

that a public body that constructs an improvement need not condemn for the possibility of an act of God); <u>Aasamundstad v. State</u>, 763 N.W.2d 748, 758 (N.D. 2008) (noting that North Dakota recognizes "an act-of-God defense" to a claim for the taking or damaging of private property).  But we need not — and do not — decide that question today, for the June 2006 flood was not an act of God under the facts alleged by the Plaintiffs.[5]

An "act of God" is defined in our precedents as "[a]ny accident due to natural causes directly and exclusively without human intervention, such as could not have been prevented by any amount of foresight and pains, and care reasonably to have been expected."  <u>City of Portsmouth v. Culpepper</u>, 192 Va. 362, 367, 64 S.E.2d 799, 801 (1951) (internal quotation marks and citation omitted).  "To relieve one of liability because a flood is, in law, an 'an act of God,' it must appear that the act of God was the sole proximate cause of the injury."  <u>Cooper</u>, 248 Va. at 425, 448 S.E.2d at 408 (some internal quotation marks and citation omitted).  And "[i]t has been held in Virginia since 1849 that all human agency is to be excluded from creating or entering into the cause of mischief, in order that it may be deemed an Act of God."  <u>Culpepper</u>, 192 Va. at

_____

[5] VDOT is, of course, free to prove otherwise should the case proceed to trial.

13

367, 64 S.E.2d at 801 (internal quotation marks and citation omitted).

The storm that led to the June 2006 flood was no doubt severe, but it was not unprecedented — Hurricane Agnes in 1972 produced a greater water flow in the relocated Cameron Run. That the channel would at times be subjected to heavy water flows, then, was not unforeseeable. More importantly, however, the Plaintiffs allege that the June 2006 flood was the result not of natural causes but of human agency: Had VDOT not allowed several feet of sediment to accumulate in the relocated Cameron Run, they claim, "the vast majority of [their] homes would not have been flooded at all, and those few that did would have suffered only minor flooding." The Plaintiffs allege, moreover, that VDOT's resident engineer recognized as early as 1970 that sediment accumulating in the channel could lead to flooding but denied VDOT's responsibility for dredging it.

In sum, no matter which way the circuit court's holding is read, it was in error. Our review, however, is not at an end, for VDOT urges us to affirm the circuit court's judgment on one or more alternative grounds. See Shilling v. Baker, 279 Va. 720, 728, 691 S.E.2d 806, 811 (2010). We address those grounds below and find that none demands affirmance of the circuit court's dismissal of the Plaintiffs' second amended complaint.

14

IV.

A.

We begin with VDOT's claim that the Plaintiffs lack standing to maintain this inverse condemnation suit. VDOT argues that the Plaintiffs do not have standing to seek relief under Article I, Section 11 of the Constitution of Virginia for damages caused by the relocation of Cameron Run and construction of the Beltway, because they did not buy or rent their homes until many years after those public improvements were completed. The Plaintiffs, however, do not allege that their homes and personal property were damaged by VDOT's relocation of Cameron Run and construction of the Beltway. Rather, they allege that their homes and personal property were damaged by VDOT's operation of — and, in particular, its failure to maintain — the channel in the years following its relocation.[6] The Plaintiffs claim that, had VDOT not allowed several feet of sediment to accumulate in the relocated Cameron

---

[6] At oral argument, counsel for the Plaintiffs clarified that their inverse condemnation claim arises solely from VDOT's failure to maintain the relocated Cameron Run:

> We believe as we understand it that Cameron Run, the new channel, the concrete channel, as it was designed, very well may have completely mitigated the 2006 flood if it had been maintained. So it is the operation of this public use, not the construction of it, though obviously if it hadn't been constructed, it would never have been operated.

(Emphasis added).

15

Run, "the vast majority of [their] homes would not have been flooded at all, and those few that did would have suffered only minor flooding." Hence we confine our analysis to whether the Plaintiffs have standing under Article I, Section 11 to seek relief for damages resulting from VDOT's operation of, and failure to maintain, the channel.

In general terms, we have explained the concept of standing as follows:

> A party has standing if it can show an immediate, pecuniary, and substantial interest in the litigation, and not a remote or indirect interest. The concept of standing concerns itself with the characteristics of the person or entity who files suit. The point of standing is to ensure that the person who asserts a position has a substantial legal right to do so and that his rights will be affected by the disposition of the case. In asking whether a person has standing, we ask, in essence, whether he has a sufficient interest in the subject matter of the case so that the parties will be actual adversaries and the issues will be fully and faithfully developed.

Westlake Props. v. Westlake Pointe Prop. Owners Ass'n, 273 Va. 107, 120, 639 S.E.2d 257, 265 (2007) (internal quotation marks and citations omitted).

When the Plaintiffs bought or rented their homes, they acquired a bundle of rights, including the rights to possession and enjoyment. See City of Virginia Beach v. Bell, 255 Va. 395, 400, 498 S.E.2d 414, 417 (1998). And those rights were undoubtedly impaired when the June 2006 flood filled their homes with sewage-laced water. Since an inverse condemnation

16

claim arises when "the government's action . . . limit[s] property rights the [property owner] holds" at the time of the action, we conclude that the Plaintiffs have standing under Article I, Section 11 to seek relief for damages caused by VDOT's operation of, and failure to maintain, the relocated Cameron Run.  Kitchen, 275 Va. at 386, 657 S.E.2d at 136-37 (quoting Richmeade, 267 Va. at 603, 594 S.E.2d at 609); see also Swift & Co. v. City of Newport News, 105 Va. 108, 120, 52 S.E. 821, 825 (1906) ("It is the direct disturbance of a right which the owner had enjoyed in connection with his property that gives the right of action." (internal quotation marks and citation omitted)).

B.

We now turn to VDOT's argument that the Plaintiffs' inverse condemnation claim must be dismissed because the Plaintiffs fail to identify or allege a specific appurtenant right connected to their homes that VDOT damaged when it constructed the Beltway.  According to VDOT, the word "damaged" in Article I, Section 11 does not encompass physical damage to tangible property, but only damage to intangible property rights.  Relying on our decisions in Board of Supervisors of Prince William County v. Omni Homes, Inc., 253 Va. 59, 481 S.E.2d 460 (1997), and Richmeade, VDOT contends that property is damaged in the constitutional sense only when "an

17

appurtenant right connected with the property is directly and specially affected by a public use and that use inflicts a direct and special injury on the property which diminishes its value."  Omni Homes, 253 Va. at 72, 481 S.E.2d at 467.

We reject VDOT's limited view of the word "damaged" in Article I, Section 11.  Our recognition in Omni Homes and Richmeade of the constitutional right to recover for damage to an appurtenant right to property does not exclude the right to recover for physical damage to property itself.  City of Lynchburg v. Peters, 156 Va. 40, 49, 157 S.E.2d 769, 772 (1931) (noting that the word "damaged" was added to Article I, Section 11's predecessor to cover "cases where the corpus of the owner's property itself, or some appurtenant right or easement connected therewith, or by the law annexed thereto, is directly (that is, in general if not always, physically) affected, and is also specially affected (that is, in a manner not common to the property owner and to the public at large)" (citation omitted)); Lambert v. City of Norfolk, 108 Va. 259, 265, 61 S.E. 776, 778 (1908) ("The meaning of the word 'damaged' was neither enlarged nor restricted by the Constitution.  It must, therefore, have been used in the same sense and with the same meaning that it had at common law — not damage to the feelings, tastes or sentiments, but physical damage to the corpus or to some right of property appurtenant thereto.").  We have

18

therefore allowed recovery in cases in which only physical damage to property itself was alleged. E.g., Jenkins v. County of Shenandoah, 246 Va. 467, 469-70, 436 S.E.2d 607, 608-09 (1993) (water discharge from drainage easement); McDonnell, 234 Va. at 238-39, 360 S.E.2d at 843 (sewage discharge); Burns v. Board of Supervisors of Fairfax County, 218 Va. 625, 626, 238 S.E.2d 823, 824 (1977) (water discharge from sewer); Morris v. Elizabeth River Tunnel Dist., 203 Va. 196, 197, 123 S.E.2d 398, 399 (1962) (water damage); Heldt v. Elizabeth River Tunnel Dist., 196 Va. 477, 478, 84 S.E.2d 511, 513 (1954) (same).

Neither Omni Homes nor Richmeade alters this well-established precedent. In Omni Homes, the property owner complained of interference with an alleged appurtenant right to property, not physical damage to property itself. 253 Va. at 63-65, 481 S.E.2d at 461-62. In particular, the property owner alleged that Prince William County's purchase of adjoining land affected the property owner's ability to secure higher zoning classification for planned development. Id. In that context, we observed that "Virginia law holds partial diminution in the value of property compensable only if it results from dislocation of a specific right contained in the property owner's bundle of property rights." Id. at 72, 481 S.E.2d at 467 (citing Lambert, 108 Va. at 268, 61 S.E. at 778-79).

19

Similarly, in Richmeade, the property owner claimed that the City of Richmond denied a request to vacate streets, thereby hindering the property owner's ability to develop two parcels as a single development. 267 Va. at 600, 594 S.E.2d at 607. Relying on Omni Homes, we explained that "[t]o take or damage property in the constitutional sense does not require that the sovereign actually invade or disturb the property. Taking or damaging property in the constitutional sense means that the governmental action adversely affects the landowner's ability to exercise a right connected to the property." Id. at 602, 594 S.E.2d at 609 (citing Omni Homes, 253 Va. at 72, 481 S.E.2d at 467). When such a right connected to the property is adversely affected by governmental action, we continued, "the measurement of that compensation may be based on a decline in the value of the subject property." Id. at 603, 594 S.E.2d at 609.

In both Omni Homes and Richmeade, it is clear that we addressed only whether an alleged appurtenant right to property had been damaged within the meaning of Article I, Section 11. And in doing so, we did not contemplate recovery for physical damage to property itself or limit a property owner's longstanding right to recover for such damage in an inverse condemnation suit.

## C.

VDOT also contends that the Plaintiffs' inverse condemnation claim must be dismissed because VDOT was not responsible for the dramatic urbanization of the Cameron Run Watershed that occurred after the Beltway was completed or the construction of the Huntington Metro and Jones Point. We agree with VDOT that it cannot be held liable for the damage to the Plaintiffs' homes caused by these later developments; its liability is limited to the damage caused by its operation of (including its failure to maintain) the relocated Cameron Run. But it is for a jury — not us — to determine the cause of the damage to the Plaintiffs' homes. Heldt, 196 Va. at 483-84, 84 S.E.2d at 515 (concluding that it was for the jury to determine from the evidence whether flood damage to the plaintiff's buildings was attributable to the defendant's "construction of the tunnel [or] to other causes," such as the plaintiff's failure to install "gutters and downspouts [on the buildings] as required by the city ordinance").

## D.

VDOT further argues that the Plaintiffs' inverse condemnation claim must be dismissed because they do not allege that their homes were damaged for public use. According to VDOT, the government's obligation under Article I, Section 11 to pay just compensation for a damaging is only triggered when

21

the government "engage[s] in an affirmative and purposeful act that devotes private property or a related property right[] to public use." The Plaintiffs, VDOT argues, "d[o] not allege that [it] relocated Cameron Run onto [their] properties or [that it] intentionally pumped water on their properties." "Rather," VDOT maintains, "all that [the Plaintiffs] allege[] is that the June 2006 Flood was caused by the public use of the Beltway, and that VDOT should be required to pay just compensation because the public benefits from the Beltway."

We reject VDOT's narrow reading of Article I, Section 11. There is nothing in that section's text or history that limits the government's constitutional obligation to pay just compensation to only damages caused by its "affirmative and purposeful" acts. Moreover, we have recognized that the government's failure to act can give rise to a compensable damaging under Article I, Section 11. Jenkins, 246 Va. at 471, 436 S.E.2d at 610.

In Jenkins, the owners of two residential subdivision lots filed an inverse condemnation suit against Shenandoah County and others, alleging that their lots had been damaged by spillover from a stormwater drainage channel. Id. at 468-69, 436 S.E.2d at 608-09. The owners claimed that the subject drainage easement constituted a public use and presented evidence at trial that Shenandoah County's drainage channel was

22

part of a water discharge system that served to divert water onto their lots. Id. at 470, 436 S.E.2d at 609. They also presented evidence that the spillover occurred because the drainage channel was not constructed in accordance with the original subdivision plans that had been submitted to Shenandoah County for approval and that had been approved by VDOT. Id. at 469, 436 S.E.2d at 609. Shenandoah County argued that, although it owned the drainage easement, it had no duty to maintain the easement and that the owners' suit was barred by the doctrine of sovereign immunity. Id. at 468, 436 S.E.2d at 608. The circuit court agreed and ruled that Shenandoah County was shielded by sovereign immunity. Id. The owners' suit was therefore dismissed. Id.

We reversed. First, we held that Shenandoah County was not entitled to sovereign immunity because an action brought under Article I, Section 11 is not a tort but a contract action, and thus not barred by sovereign immunity. Id. at 470, 436 S.E.2d at 609. Then we considered whether the owners had made out a prima facie claim for a damaging. Id. Shenandoah County argued that they had not because it "took no steps with respect to the maintenance, construction or supervision or operation of the drainage easements." Id. We disagreed, holding that Shenandoah County's drainage easement was a public use under our precedents and that the County's failure to

23

maintain it did not "absolve the County of liability" under Article I, Section 11.  Id. at 470-71, 436 S.E.2d at 609-10. When Shenandoah County "accepted the dedication of the easement," we explained, "the County also accepted the burden of maintaining it in the manner necessary to protect the servient estates."  Id. at 471, 436 S.E.2d at 610.

Pursuant to our decision in Jenkins, then, the government cannot evade liability for a damaging under Article I, Section 11 by simply choosing not to act when it has a duty to do so. Accordingly, the Plaintiffs' inverse condemnation claim against VDOT does not fail just because it arises from VDOT's subsequent operation of, and failure to maintain, the relocated Cameron Run, rather than from VDOT's relocation of the channel and construction of the Beltway.

We further reject VDOT's contention that the Plaintiffs' inverse condemnation claim must be dismissed because, in its view, the relocated Cameron Run is not a public use.  According to VDOT, the Beltway is the public use, not the channel.  Such a narrow view of the Beltway vis-á-vis the relocated Cameron Run, in our opinion, ignores the relationship of the two public improvements and their respective functions.  The channel is necessary to the continued operation of the roadway.  Without the relocated Cameron Run to drain water from nearby urbanized lands, the Beltway would undoubtedly be even more susceptible

to flooding and, consequently, more frequent closures.  That VDOT refused to maintain the relocated Cameron Run and instead chose to "tolerat[e] temporary inundation" of the Beltway does not diminish the importance of the channel to the continued operation of the roadway.

Despite the concerns raised by local officials about the accumulation of sediment in the relocated Cameron Run and the resulting increase in the risk of flooding to neighboring residential developments such as Huntington, VDOT declined to maintain the channel.  VDOT made this decision (at least in part) because it was willing to accept temporary flooding of the Beltway.  In essence, then, VDOT elected to use the Beltway and nearby residential developments as makeshift storage sites for excess stormwater instead of allocating its resources to maintain the relocated Cameron Run.

So viewed, VDOT's choice not to maintain the relocated Cameron Run is no different from Hampton Roads' decision in McDonnell, 234 Va. at 238-39, 360 S.E.2d at 843, to use private property as a storage site for excess discharge from its sewage system or the Tunnel District's decision in Heldt, 196 Va. at 480, 84 S.E.2d at 513-14, to allow water pumped from a construction site to flow unabated onto private property.  Like Hampton Roads and the Tunnel District, VDOT has asked private property owners (the Plaintiffs) to bear the cost of a public

25

improvement (the Beltway).  This is the type of mischief that Article I, Section 11 was adopted more than 100 years ago to remedy.  See 1 Report of the Proceedings and Debates of the Constitutional Convention 699 (J.H. Lindsay ed., Hermitage Press, Inc. 1906) ("[I]t is the inherent right and justice of the contention that the rights of the private individual . . . ought not to be sacrificed to the public welfare, and that it is the function of bodies of this sort, in the public interest, to impose such restrictions upon legislative power that will insure the rights of the private citizen.").  Cf. City Council of Montgomery v. Maddox, 7 So. 433, 436 (Ala. 1889) (noting that the "injured" clause in the Alabama Constitution was adopted "to require the public to bear the burden of municipal improvements of this nature made for the public benefit, and not to crush the private citizen by imposing upon him alone the entire damage which may have been caused to his property").

We thus conclude that the Plaintiffs have sufficiently alleged that their homes were damaged for public use under Article I, Section 11 to withstand demurrer.

E.

Finally, VDOT contends that at the very least the Plaintiffs' inverse condemnation claim as to their personal property must be dismissed.  While VDOT acknowledges that "the sovereign prerogative of eminent domain extends to personal

26

property," it contends that "the General Assembly has <u>not</u> extended that power to the [Transportation] Commissioner." As a result, VDOT submits, the Plaintiffs cannot recover under Article I, Section 11 for damage to their personal property.[7]

To make this argument, VDOT relies solely on <u>Burns</u>, in which we explained that "[t]he owner whose property is taken or damaged for public use has a right to waive all other remedies and to sue upon an implied contract that he will be paid therefor such amount as would have been awarded if the property had been condemned under the eminent domain statute." 218 Va. at 627, 238 S.E.2d at 825. The General Assembly, as VDOT points out, has only authorized the Commissioner to acquire "lands, structures . . . and . . . interest[s] in lands that are necessary to construct, maintain, or repair the public highways." Code § 33.1-89(A).

We reject VDOT's contention. First, <u>Burns</u> cannot bear the weight that VDOT ascribes to it. There the property owners did not seek relief for damage to personal property, so we said nothing on the issue. That case, moreover, did not involve a

---

[7] VDOT also asserts that the Plaintiffs cannot recover for business losses or repair costs. Plaintiffs, however, make no claim for business losses. As for repair costs, the Plaintiffs do allege that they "paid tens of thousands of dollars for the costs of restoring their homes," but they do not appear to be seeking recovery for those costs. Instead, they appear to be seeking recovery only for the "substantial diminished value" of their homes and the "loss of [their] personal property."

27

sudden flood of the magnitude of the one that gave rise to this inverse condemnation suit.

Second, in City of Richmond v. Williams, 114 Va. 698, 77 S.E. 492 (1913), we held that a statute "in obedience to" Article I, Section 11's predecessor required compensation for the costs of moving lumber piled upon the property as a result of a partial condemnation. Id. at 701-03, 77 S.E. at 493-94. "[J]ust compensation," we said, "must be awarded for the land or other property taken, and damages must be awarded resulting to adjacent or other property of the owner, or to the property of any other person." Id. at 702-03, 77 S.E. at 494. And more recently, in Potomac Electric Power Co. v. Fugate, 211 Va. 745, 180 S.E.2d 657 (1971), we observed that, under Williams, "compensation for the costs of relocating the personal property was constitutionally required" where "personal property [was] damaged or required to be removed by public undertaking." Id. at 750, 180 S.E.2d at 660.

In accordance with Williams and Potomac Electric Power, we conclude that the Plaintiffs have sufficiently alleged an inverse condemnation claim under Article I, Section 11 for damage to their personal property to survive demurrer. We stress, however, that the Plaintiffs can only recover for damage to personal property that was appurtenant to their

28

homes; for Article I, Section 11's primary focus is the taking and damaging of real property.

V.

When the government constructs a public improvement, it does not thereby become an insurer in perpetuity against flood damage to neighboring property. And nothing in today's opinion should be read as imposing such an obligation on VDOT. But under our precedents, a property owner may be entitled to compensation under Article I, Section 11 of the Constitution of Virginia if the government's operation of a public improvement damages his property.

Because the facts alleged in the Plaintiffs' second amended complaint, if taken as true, establish that their homes and personal property were damaged by VDOT's operation of, and failure to maintain, the relocated Cameron Run, we conclude that the circuit court erred in dismissing their inverse condemnation suit on VDOT's demurrer. We thus reverse the circuit court's judgment and remand the case for further proceedings consistent with this opinion.

Reversed and remanded.


JUSTICE McCLANAHAN, with whom JUSTICE GOODWYN joins, dissenting.

Today the Court sanctions what can only be deemed a "constitutional tort," based on a theory of causation, not the

principles of condemnation.  Noticeably absent from the allegations in this case is a contention, or even facts purporting to show, that VDOT exercised its power of eminent domain in damaging Plaintiffs' properties.  This deficiency is fatal to the Plaintiffs' claim since there is no cause of action for inverse condemnation without the exercise of such power.

When a property owner brings an action under Article I, Section 11 of the Constitution of Virginia, for the damaging of his property for a public use, he is entitled to be paid "such amount as would have been awarded if the property had been condemned under the eminent domain statute."  Burns v. Board of Supervisors, 218 Va. 625, 627, 238 S.E.2d 823, 825 (1977). "The power of eminent domain is vested in the Commissioner [of Highways] by Code § 33.1-89."  Trout v. Commonwealth Transportation Commissioner, 241 Va. 69, 72, 400 S.E.2d 172, 173 (1991).  Pursuant to that section, the Commissioner is granted authority to acquire by "power of eminent domain such lands, structures, rights-of-way, franchises, easements and other interests in lands . . . deemed to be necessary for the construction, reconstruction, alteration, maintenance and repair of the public highways of the Commonwealth."  Code § 33.1-89(A).  "[F]or these purposes and all other purposes incidental thereto," the Commissioner "may condemn property

30

. . . deemed useful or necessary in carrying out the purposes aforesaid." Id. "It is elementary, however, that the Commissioner can condemn property only for a public purpose," and thus, is not empowered to condemn property otherwise. Stewart v. Fugate, 212 Va. 689, 691, 187 S.E.2d 156, 159 (1972). Accordingly, under Article I, Section 11 of the Constitution, a private property owner is entitled to "just compensation" when the Commissioner of Highways takes or damages property "for public uses" in the lawful exercise of its power of eminent domain as defined by Code § 33.1-89.

Plaintiffs do not allege that VDOT damaged their properties in the exercise of its power of eminent domain because they do not allege that the use of their properties was "necessary for the construction, reconstruction, alteration, maintenance [or] repair of the public highways of the Commonwealth" or for "purposes incidental thereto." Code § 33.1-89(A). Rather, Plaintiffs allege that their properties sustained flood damage caused by VDOT's failure to dredge or otherwise maintain Cameron Run. The only highway at issue is the Capital Beltway, and Plaintiffs do not contend the damaging of their properties was necessary, or even useful, for the maintenance of the Beltway.[1]

---

[1] Indeed, VDOT could not have successfully petitioned for condemnation of plaintiffs' properties seeking to have just

31

Not only is Plaintiffs' claim insufficient for failure to allege that their properties were damaged through VDOT's exercise of its power of eminent domain under Code § 33.1-89, Plaintiffs fail to allege that their properties were damaged for public uses.[2]  Under Article I, Section 11, "just

---

compensation determined on the grounds that the flooding of Plaintiffs' properties was necessary or useful for the maintenance of the Beltway.  Yet, this is the effect of the majority's ruling.  If Plaintiffs have a viable cause of action for inverse condemnation against VDOT, then VDOT arguably has a viable cause of action for condemnation of Plaintiffs' properties despite the fact that the damage to their properties is not alleged to have been necessary for the maintenance of the Beltway.  This fundamental point was stated well by the Supreme Court of Oregon in rejecting a similar attempt to characterize unnecessary damage as an inverse condemnation claim:

> Had the defendant district instituted condemnation proceedings for the appropriation of plaintiffs' lands and in such proceedings alleged that said lands were necessary for public use for the reason that the district expected in the future to fail to maintain its ditches properly and expected to allow them to become clogged with vegetation, we surmise that no court would have entertained its petition.  In other words, the right of eminent domain cannot be exercised to permit unnecessary damage and waste.

Patterson v. Horsefly Irr. Dist., 69 P.2d 282, 289 (Ore. 1937).

[2] The majority reasons that the relationship between the Capital Beltway, designated by the Plaintiffs as the "public use," and Cameron Run is such that maintenance of Cameron Run was necessary to the continued operation of the Beltway.  This rationale misses the point, which is that the damaging of the Plaintiffs' properties must be necessary or useful for the maintenance of the Beltway.  In any event, Article I, Section 11 does not impose upon VDOT the duty to act to prevent damage.  Such a duty, if it exists, must exist under tort law.

32

compensation" is guaranteed when private property is "damaged for public uses." (Emphasis added.) It does not provide that just compensation is guaranteed when damage to private property can be causally traced to a public improvement. Only when private property is taken or damaged <u>for a public use</u> is the power of eminent domain exercised. Or, as this Court has stated, the right of recovery arises from "damage done to property by an agency clothed with the power of eminent domain in effecting a public improvement." <u>Heldt v. Elizabeth River Tunnel Dist.</u>, 196 Va. 477, 482, 84 S.E.2d 511, 514 (1954) (emphasis added).[3]

---

[3] The majority compares the "use" of Plaintiffs' properties to the use of the landowners' property in <u>Jenkins v. County of Shenandoah</u>, 246 Va. 467, 436 S.E.2d 607 (1993). In <u>Jenkins</u>, the County was using the landowners' property for a drainage easement that was alleged to be for the public benefit. <u>Id.</u> at 470-71, 436 S.E.2d at 609-10. Likewise, in <u>Burns</u>, the property was used for drainage from a storm sewer alleged to be for the public benefit. 218 Va. at 628-29, 238 S.E.2d at 825-26. <u>See also</u> <u>Hampton Roads Sanitation District v. McDonnell</u>, 234 Va. 235, 237, 360 S.E.2d 841, 842 (1987) (property used for sewage discharge from pump station). In each of these cases, the property owners alleged that their properties were being used in the operation of the respective public improvements. In this case, Plaintiffs allege their property was damaged by VDOT's failure to dredge Cameron Run, not so that the public could benefit from Cameron Run.

Moreover, while in each of these cases, the public improvements or facilities were deemed to be public uses, in none of these cases did the Court address whether the landowners were damaged <u>for</u> public uses. Nor did these cases involve the scope of VDOT's power to damage property deemed necessary for the maintenance of the public highways.

33

In holding that Plaintiffs have stated a cause of action for a constitutional damaging, the majority has replaced the plain language of the Constitution requiring that the claimed damages be for public uses with a simple causation requirement. The majority describes the constitutional damaging provision as entitling a property owner to compensation "if the government's operation of a public improvement damages his property."  Yet, the Constitution actually states that a property owner is entitled to compensation if the property is damaged "for" a public use.  The generally accepted definitions of "for" include "having as [a] goal or object," "in order to be, become, or serve as," "in order to bring about or further," "to supply the need of," or "with the purpose or object of." Webster's Third New International Dictionary 886 (1993).  Under any of these definitions, it is clear that Plaintiffs do not allege that VDOT flooded their lands "for" a public use.  In other words, Plaintiffs do not claim that VDOT damaged their lands with the goal of, in order to, or to further the maintenance of the Beltway.  By re-wording the Constitution to entitle property owners to compensation for damage "caused by" a public improvement, the majority has eliminated the requirement that the damages be "for" a public use, thereby

altering the purpose and scope of Article I, Section 11, and enlarging the breadth of the power of eminent domain.[4]

Boiled down to its essence, Plaintiffs allege that VDOT had a duty under the law to dredge or otherwise maintain Cameron Run, and its failure to do so caused the flood damage to their properties. This claim is nothing more than a claim for negligence, brought under the guise of the constitutional damaging clause. While it is true that a governmental entity, such as VDOT, may commit acts of negligence in exercising its power of eminent domain, the acts of negligence alone do not constitute a constitutional taking or damaging.[5] It is the

---

[4] There is an important distinction between establishing the cause of the damage, which is a universal requirement for a plaintiff seeking recovery for damages under any theory, and establishing the nature and purpose of the act giving rise to the damage, which determines whether a constitutional damaging has occurred. Under Article I, Section 11, the act of taking or damaging a landowner's property must be for a public use.

Under the majority's analysis, however, as long as a property owner can prove a causal link between a public improvement and the property damage, there has been a constitutional damaging, without regard to whether the power of eminent domain has been exercised. Yet, the exercise of the power of eminent domain is what distinguishes a claim for constitutional damaging from other types of damage claims. In all cases, a plaintiff must prove the defendant caused the plaintiff's damages. In order to recover for a constitutional damaging, though, a plaintiff must prove the damage was "for" a public use.

[5] The fact that a landowner may elect to waive his action in tort and bring suit under the contract implied by the constitutional damaging provision is beside the point. See Burns, 218 Va. at 627, 238 S.E.2d at 825. The landowner has no implied contract claim under the Constitution unless his

35

exercise of the power of eminent domain that gives rise to a claim of constitutional taking or damaging. In fact, "we have consistently adhered to the view that the eminent domain provisions in the Virginia Constitution have no application to tortious or unlawful conduct." State Highway and Transp. Comm'r v. Lanier Farm, Inc., 233 Va. 506, 511, 357 S.E.2d 531, 534 (1987); see also Eriksen v. Anderson, 195 Va. 655, 660, 79 S.E.2d 597, 600 (1954) (the Constitution and Code vest the Commissioner with the power of eminent domain "insofar as may be necessary" for the construction, maintenance, and repair of the highways but has no application to unlawful or negligent acts). By allowing ordinary tort claims, which are subject to sovereign immunity protections, to proceed as constitutional damage claims, the actions permissible against the government now appear limitless.

I would hold that Plaintiffs have not alleged sufficient facts to state a claim for constitutional damaging under Article I, Section 11.

---

property is damaged through the exercise of the power of eminent domain, i.e., for a public use.