## Richmond

TOWN OF CAPE CHARLES, VIRGINIA, A MUNICIPAL CORPORATION v.
BALLARD BROTHERS FISH COMPANY, INCORPORATED.

March 16, 1959.

Record No. 4885.

Present, All the Justices.

The opinion states the case.

*Benjamin W. Mears, Jr.,* and *C. A. Turner, Jr.* (*W. A. Dickinson,* on brief), for the plaintiff in error.

*William King Mapp* (*Mapp & Mapp,* on brief), for the defendant in error.

BUCHANAN, J., delivered the opinion of the court.

■ This is an eminent domain proceeding brought by the Town of Cape Charles, in Northampton county (referred to herein as the Town), to condemn a right or easement to dredge a deep water channel from Chesapeake Bay into Kings Creek through oyster grounds held by Ballard Brothers Fish Company, Inc. (herein called Ballard), under lease from the Commonwealth of Virginia.

Kings Creek is an estuary on the east side of the Chesapeake Bay. By Act passed in 1950 Congress authorized the dredging of a channel into Kings Creek 100 feet wide, 8 feet deep and about 6,400 feet long, together with an anchorage and turning basin, and in 1956 appropriated funds for the work, but the Town was required to secure releases from the lessees or owners of oysters or clam grounds that might be affected by the initial and future maintenance dredging.

Ballard is the lessee from the Commonwealth of a large area of oyster ground in Kings Creek, through which the proposed deep water channel would run. Being unable to agree with Ballard on damages, the Town, on February 7, 1957, filed its petition to condemn the right or easement to dredge the proposed channel and to do such future dredging as might be necessary for its proper maintenance. Ballard responded with a plea in abatement, demurrer and motion to dismiss, challenging the right of the Town to maintain the action, which were overruled and by an order of March 11, 1957, the court appointed five commissioners to ascertain a just compensation for the right or easement sought by the Town. These commissioners met, viewed the premises, heard evidence and could not agree. Three of them submitted a majority report and the other two a minority report. These were put in formal terms and filed on April 4, 1957. The majority report allowed total compensation of $11,385, while the minority fixed the total at $74,750. Ballard excepted to the majority report and after hearing evidence the court by order of Octo-

ber 4, 1957, set it aside and appointed five other commissioners. These reported that they could not agree, were discharged and a third group of five commissioners was appointed, who viewed the premises, heard the evidence offered by the parties, and on November 27, 1957, filed their report awarding to Ballard $13,500 for the oyster ground taken and $31,500 for damage to the residue, being a total of $45,000.

The Town filed exceptions to this report which were overruled and the report was confirmed by order entered January 17, 1958. We granted the Town a writ of error to this order and the order of October 4, 1957.

Ballard filed a motion in this court to dismiss the writ on the ground that the Town had not paid into court either the $11,385 first awarded or the $45,000 of the second award, and hence under § 25-22 of the Code the proceeding should be dismissed. The motion is without merit and is overruled.

The Town was given a general right to condemn by § 62-117.3, part of Title 62, Chapter 7.1 of the Code relating to Federal River, Harbor and Flood Control Projects. Section 28-122.1 of the Code, 1958 Cum. Supp., (Acts 1950, p. 92), gave the Town the specific right to condemn any interest in oyster planting grounds and directed that the procedure should conform to the provisions of Title 33, Chapter 1, Article 5 of the Code, relating to eminent domain proceedings by the Highway Department. Article 5 of Chapter 1 of Title 33, pursuant to which this case was conducted, provides in § 33-67 that after an award is made and is confirmed, altered or modified, "the sum so ascertained by the court as compensation and damages" may be paid into court or to the owner. No sum has been finally ascertained by the court because the order of the court confirming the last award was suspended pending decision of this appeal granted to the Town.

Furthermore, § 25-22 in Title 25 of the Code relating generally to eminent domain, provides that if the amount ascertained by the commissioners be not paid either to the owner or into court within three months from the date of the filing of the report, the proceeding shall, "on motion of the party condemning or of any defendant, be vacated and dismissed as to him, but not otherwise; * *." Ballard made no such motion in the trial court but, on the contrary, excepted to the majority report, succeeded in having it set aside, and thus brought about the further proceedings in which it litigated its claims

without reference to the nonpayment of the first award. Under these circumstances its motion in this court to dismiss the proceeding comes too late. *Cf. Virginia Electric and Power Co. v. Call,* 195 Va. 454, 464, 78 S. E. 2d 670, 675.

The errors assigned by the Town relate only to the action of the trial court in setting aside and refusing to confirm the majority report of the first commission which awarded to Ballard compensation and damages in the sum of $11,385. It assigned no error to the action of the court in confirming by its order of January 17, 1958, the report of the last commission which awarded compensation and damages to Ballard in the sum of $45,000, other than as the last-mentioned order overruled its motion to confirm the majority report of the first commission. We are therefore now concerned only with the validity of the order of October 4, 1957, which set aside the report of the majority of the first commission.

Ballard assigned cross error to the action of the court in overruling its plea in abatement, demurrer and motion to dismiss, and in over-ruling certain of its exceptions to the majority report, but these assignments are without merit and in the view we take of the case need not be discussed.

In the hearing on Ballard's exceptions to the majority report it developed that Commissioners Clark and Steelman, who signed the minority report, after viewing the premises with the other three commissioners, went together back on the property a day or two later for another view in the absence of the other three commissioners. They walked over the oyster rocks, said Clark, "for our own bene-fit, so we could arrive at what we thought would be damage to the rocks from taking the basin." He was asked by the court whether he could have got the information he obtained on the second visit by asking the witnesses who had testified before the court and com-missioners, and he said he did not think he could without his own inspection. Asked if it did not occur to him to make his investiga-tion while all the commissioners were there, so as to give them the benefit of it, he replied that he could not have done so because the tide was up that day. He said that after the first view and in the following conference of the commissioners, $45,000 was his and Steelman's figure, but they had not then considered the damage from depriving Ballard of the use of the ground for three years, which they estimated at $30,000.

In a letter to counsel the court reviewed this situation, expressed

the view that it was an indiscretion which amounted to misconduct, and stated that the disparity between the two reports was so glaring that it suggested a lack of open discussion among the commissioners and called for a rejection of both reports.

In the order setting aside the majority report, however, the court based its ruling only on errors committed, as it concluded, in giving to the commissioners Instruction No. 1 and in rejecting evidence of a comparative sale offered by Ballard, both as relied on in Ballard's exceptions No. 1 and No. 2 to the majority report.

By Instruction No. 1 the commissioners were told in paragraph (1) that just compensation was the difference between the fair market value of the leaseholds affected for use as oyster grounds before the channel was dredged and after it was dredged, and such damage as might reasonably be expected to result from the future maintenance of the channel; in paragraph (2) that it was the duty of Ballard to minimize its damages by salvaging what oysters it could from the affected areas, and in determining the damages to the oysters in those areas the commissioners must consider the reasonable cost and expense of taking them up and replanting them, if the commissioners believed that Ballard had other vacant and suitable ground on which to replant them, and consider the incidental damage Ballard might sustain in this procedure, such as increased mortality of the oysters and loss of regular growth, but such incidental damage must be reasonably certain and not speculative; and if Ballard did not have suitable ground for replanting, then its measure of damage was the difference between the amount it had invested in the oysters and the amount it could realize by taking them up and selling them on the going market; and in any event Ballard could not recover for any oysters it had planted in the affected area after February 7, 1957, when the petition for condemnation was filed.

Paragraph (3) of the instruction related to damages to adjacent or other property of Ballard.

Paragraph (2) of this instruction was difficult to understand and to apply, and erroneously omitted the measure of compensation due Ballard with respect to the oysters destroyed in the affected areas.

According to the evidence the channel itself was to be dredged to an over-all dept of 9 feet with a width of 140 feet, including the slopes or banks, and for a distance of about 4,000 feet through the Ballard property, comprising an area of approximately 11 acres. There was also to be condemned an easement on strips 280 feet wide

on each side of the channel for the movement of floating plant, swinging anchors and dredge pipe lines, either floating pontoons or trestles, for the initial dredging operation and for such future dredging operations as might be necessary for the proper maintenance of the channel. This additional easement comprised an area of approximately 54 acres, and together with the channel itself embraced an area 700 feet wide through the Ballard oyster grounds. A map was filed with the petition and in evidence showing the area to be dredged in brown color and the auxiliary area in green.

The dredging operation was described as being done by dredging machinery which cut up the material in the bed of the channel and forced it through a pipe line laid on cribbing and leading to the disposal area some 4,000 feet away, into which would be dumped approximately 164,000 cubic yards of dredged material. There was evidence that some silt could be expected to escape from this pipe line which, combined with material in suspension from the cutting operation and from the effect of the tides in the disposal area, would cause damage to the planted oysters as well as to the oyster beds. It was also shown that the operation of the dredging machinery would involve a dragging or scraping movement of the wires and cables attached to the anchors placed in the areas on the side of the channel and result in damage to the oysters planted in those areas. The evidence was that the movement of the tides was at right angles to the channel to be cut and consequently material would be carried back into the channel, so that further dredging would be required within a year or 18 months, but gradually the channel would be expected to stabilize and periods of dredging would become farther apart.

According to Ballard's evidence, out of an area of some 700 acres of oyster grounds in its leasehold in Kings Creek, there was an area of 60 acres around this proposed channel that comprised its best oyster ground; that the Company had spent more than $5,000 an acre to build up the oyster grounds in this 60 acres, which carried around 1,000 bushels of oysters to the acre, and that on 4½ acres planted in the outer leg of the channel and 19½ acres planted in the green area on the map, there were about 23,000 bushels of oysters that would be destroyed by the dredging, the fair market value of which was at least $1 a bushel. The balance of the claim for damages was based on damage to the oyster grounds and the inability to use them in view of the maintenance dredging to be done in the future.

Ballard testified that his Company would never be able to plant the 4½ acres again and it would be two years before the 19½ acres could be used.

Paragraph (2) of the instruction in effect excluded from consideration the value of the oysters and the oyster beds that would be taken or destroyed by the dredging operation. The evidence showed what is necessarily true that the oysters being grown in the channel area would be dredged up and piped out to the disposal area along with the rock or soil on which they were planted. Ballard's oysters are its personal property and if taken or damaged in eminent domain proceedings, just compensation must be rendered therefor. *Richmond* v. *Williams*, 114 Va. 698, 702, 77 S. E. 492, 494; 6 Mich. Jur., Eminent Domain, § 36 at p. 722; Anno., 3 A.L.R. 2d 302, 304.

It is ordinarily the duty of the owner of property taken by eminent domain to minimize his damages so far as he reasonably can, but he is not bound to enter upon a doubtful and speculative undertaking. 18 Am. Jur., Eminent Domain, § 262, p. 903; Nichols on Eminent Domain, 3 ed., § 14.22, p. 316. There was substantial evidence that because of loss and expense it would not be practicable to take up and replant these oysters, and this would necessarily be true with respect to those cut up and carried away in the dredging process.

It is clear that in respect of the important element of compensation for oysters that would be destroyed the instruction was misleading to the commissioners and prejudicial to Ballard, particularly so when considered against the background of the great difference between the conclusions of the majority and of the minority of the first commission following the consideration by the two groups of apparently different elements of damage. The court was plainly right in setting aside the majority report on this ground. It is not necessary therefore to discuss the additional ground relating to the exclusion of evidence.

The orders of October 4, 1957, and January 17, 1958, appealed from are accordingly

*Affirmed.*