PRESENT: All the Justices

AGCS MARINE INSURANCE COMPANY, A/K/A ALLIANZ
GLOBAL CORPORATE & SPECIALTY, A/S/O
HARRIS TEETER, ET AL.

                                                    OPINION BY
v. Record No. 160221                     JUSTICE D. ARTHUR KELSEY
                                                    June 15, 2017
ARLINGTON COUNTY

FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
Louise M. DiMatteo, Judge

Two insurers paid claims for property damage to a Harris Teeter grocery store arising

from the malfunctioning of a county sewer line. Exercising their subrogation rights, the insurers

filed an inverse condemnation suit against Arlington County on the theory that the sewer backup

constituted a taking and/or damaging of private property for a public use without just

compensation in violation of the Constitution of Virginia. The circuit court dismissed the

insurers' complaint with prejudice and denied their motion for leave to file an amended

complaint.

We agree with the circuit court that the original complaint failed to state a claim for

inverse condemnation. We disagree, however, with the court's denial of the insurers' motion for

leave to amend their complaint. The allegations in the proffered amended complaint, coupled

with the reasonable inferences arising from these allegations, assert a legally viable claim for

inverse condemnation. We thus affirm in part, reverse in part, and remand for further

proceedings.

I.

Because this appeal arises from the grant of a demurrer, we state the factual allegations in

the complaint in the light most favorable to the insurers, giving them the benefit of all reasonable

inferences that arise from those allegations. *See Coutlakis v. CSX Transp., Inc.*, 293 Va. 212,

215, 796 S.E.2d 556, 558 (2017).  However, we do not accept the veracity of conclusions of law camouflaged as factual allegations or inferences.  *See Arogas, Inc. v. Frederick Cty. Bd. of Zoning Appeals*, 280 Va. 221, 224, 698 S.E.2d 908, 910 (2010).  Instead, we review all conclusions of law de novo.  *See Evans v. Evans*, 280 Va. 76, 81-82, 695 S.E.2d 173, 175-76 (2010).

In this case, the property insurers — AGCS Marine Insurance Company and Indemnity Insurance Company of North America — issued policies to Harris Teeter, the lessee of a building used for its grocery store in Arlington County.  The insurers together paid approximately $1.8 million under their policies to Harris Teeter for property damage resulting from the backup of a county sewer line that caused raw sewage to flow into the grocery store in May 2012.  The subrogated insurers filed suit against the County alleging only one count — an inverse condemnation claim under Article I, Section 11 of the Constitution of Virginia.

The original complaint stated that the sewer line and the sewage treatment plant for the sewer line "were maintained for the public purpose of supplying Arlington County with water and sewage disposal services."  J.A. at 3.  The sewage backup, the complaint alleged, "was caused by the failure of Arlington County to properly maintain and operate the sewage treatment plant."  *Id.*  The complaint provided several specific examples of this overall failure, including that the County (1) failed to "properly operate, inspect, maintain and test" the sewer system; (2) failed to maintain and repair the pumps in the plant; (3) failed to supervise its employees at the treatment plant; (4) "ignored warnings from its employees" about the equipment; (5) "bypassed safety features of the equipment"; and (6) neglected necessary repairs.  *Id.*

Nothing in the complaint expressly or impliedly alleged that the County purposefully caused the backflow of raw sewage into the Harris Teeter grocery store.  Nor did the complaint

2

allege that anyone working for the County either purposefully caused the backflow or deliberately allowed it to happen in order to keep the entire system operating for all other users of the county sewer system.

The County demurred on several grounds, the principal one being that the allegations asserted, at best, a negligence claim barred by sovereign immunity and not cognizable as a constitutional violation. The County also argued that the sewer backup did not itself constitute a public use of Harris Teeter's property. The insurers disagreed and contended that it did not matter that "the *sewage backup*" itself did not constitute a public use because the only question was "whether the *sewage treatment plant* serves a public purpose, which it obviously does." R. at 29 (emphases in original); *see also id.* at 90 (same).

The circuit court granted the County's demurrer and dismissed the case with prejudice. The insurers moved to reconsider and requested leave to file a proffered amended complaint that amplified their claim. The court denied both motions and entered final judgment.

## II.

On appeal, the insurers argue that their original complaint stated a viable claim for inverse condemnation and that, even if it did not, the proffered amended complaint provides whatever amplification of the claim may be necessary. Like the circuit court, we conclude that the original complaint sounded wholly in tort and did not state a prima facie cause of action for inverse condemnation. We disagree, however, with the circuit court's decision to deny the insurers leave to amend their complaint. The amplified allegations in the amended complaint, coupled with the reasonable inferences that one could draw from them, state a viable claim for inverse condemnation.

3

A. THE FOR-PUBLIC-USE REQUIREMENT OF INVERSE CONDEMNATION

1.

The Constitution of Virginia states

> [T]he General Assembly shall pass no law whereby private
> property, the right to which is fundamental, shall be damaged or
> taken except for public use. No private property shall be damaged
> or taken for public use without just compensation to the owner
> thereof. No more private property may be taken than necessary to
> achieve the stated public use.

Va. Const. art. I, § 11. The power of eminent domain is thus limited. Private property cannot be

"damaged or taken except for public use," and, even then, the power can be exercised only to the

extent "necessary to achieve the stated public use." *Id.* When a lawful taking or damaging of

property is justified by a public use, it must be remedied by payment of "just compensation to the

owner." *Id.*[1]

Read literally, the operative clause of Article I, Section 11 of the Constitution of Virginia

states only that the General Assembly "shall pass no law" that takes or damages private property

except for public use, *id.*, thus implying that the constitutional prohibition acts solely as a

limitation upon the legislature. For good reason, we have never accepted such a hyper-literal

reading of this provision. From ancient times, ad hoc seizures of property without direct

legislative approval were understood to violate the requirement of just compensation no less than

outright legislative confiscations. *See* Magna Carta, ch. 28 (prohibiting the King's officers from

taking "the corn or other goods of any one without instantly paying money for them, unless he

---

[1] Though the underlying principles are constitutional, a multitude of legislative
enactments manage the formal process of eminent domain and just compensation. *See* Code
§§ 25.1-100 to -421; *see also id.* §§ 1-219.1, 5.1-34, 10.1-201, 15.2-1901.1, 33.2-1000 to -1034,
56-49, 56-260, 56-347, 56-464. *See generally* 2 Charles E. Friend & Kent Sinclair, Friend's
Virginia Pleading and Practice § 27.22, at 27-72 to -86 (2d ed. 2007 & Supp. 2016-2017).

4

can obtain respite from the free-will of the seller"), *reprinted in* Boyd C. Barrington, The Magna Carta and Other Great Charters of England 228, 237 (1899). That ancient maxim found its voice in the Takings Clause of the Fifth Amendment to the United States Constitution, a provision that St. George Tucker believed was meant "to restrain the arbitrary & oppressive measure of obtaining supplies by impress[ment] as was practiced during the last war, not infrequently without any Compensation whatsoever." 4 St. George Tucker, Ten Notebooks of Law Lectures 147 (in the Tucker-Coleman Papers on file with the Earl Gregg Swem Library, College of William and Mary); *see also* 1 St. George Tucker, Blackstone's Commentaries, Editor's App. Note D, at 305-06 (same).

Following in this tradition, the Constitution of Virginia declares the right to private property to be "fundamental." Va. Const. art. I, § 11; *see also* Code § 1-219.1(A). This view presupposes that an essential "interdependence exists between the personal right to liberty and the personal right in property. Neither could have meaning without the other." *Lynch v. Household Fin. Corp.*, 405 U.S. 538, 552 (1972). "In a word," James Madison said, "as a man is said to have a right to his property, he may be equally said to have a property in his rights." James Madison, Property (Mar. 29, 1792), *reprinted in* 1 The Founders' Constitution 598, 598 (Philip B. Kurland & Ralph Lerner eds., 1987). Madison continued, "If the United States mean to obtain or deserve the full praise due to wise and just governments, they will equally respect the rights of property, and the property in rights." *Id.* at 599. It "has long been recognized," therefore, that property rights are "basic civil rights," *Lynch*, 405 U.S. at 552, and that a government's failure to protect private property rights puts every other civil right in doubt.[2]

---

[2] *See* 1 William Blackstone, Commentaries *129 (stating that individual rights and liberties "may be reduced to three principal or primary articles — the right of personal security, the right of personal liberty, and the right of private property — because as there is no other

2.

Informed by these background principles, Virginia law recognizes inverse condemnation as a viable theory of recovery for de facto violations of Article I, Section 11 of the Constitution of Virginia. *See generally* Kent Sinclair, Sinclair on Virginia Remedies § 64-1, at 64-1 to -5 (5th ed. 2016). Inverse condemnation arises out of the self-executing nature of Article I, Section 11 and thus must be distinguished from common-law tort claims. *See Burns v. Bd. of Supervisors*, 218 Va. 625, 627, 238 S.E.2d 823, 825 (1977).

Inverse condemnation permits recovery only when "property is taken or damaged *for public use*" — thereby bestowing on the owner a right to "sue upon an *implied contract* that he will be paid therefor such amount *as would have been awarded* if the property had been condemned under the eminent domain statute." *Id*. (emphases added).[3] This implied-contract characterization captures well the idea that just-compensation provisions represent a "historical compact" between citizens and their government that "has become part of our constitutional culture." *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1028 (1992).

---

known method of compulsion . . . but by an infringement or diminution of one or other of these important rights, the preservation of these, inviolate, may justly be said to include the preservation of our civil immunities in their largest and most extensive sense" (altering punctuation)); *see also Fuller v. Edwards*, 180 Va. 191, 197, 22 S.E.2d 26, 29 (1942) (same); 2 Joseph Story, Commentaries on the Constitution of the United States § 1790, at 547-48 (Thomas M. Cooley ed., 4th ed. 1873) ("Indeed, in a free government almost all other rights would become utterly worthless if the government possessed an uncontrollable power over the private fortune of every citizen. One of the fundamental objects of every good government must be the due administration of justice; and how vain it would be to speak of such an administration, when all property is subject to the will or caprice of the legislature and the rulers.").

[3] *See also Richmeade, L.P. v. City of Richmond*, 267 Va. 598, 600-01, 594 S.E.2d 606, 608 (2004); *Richmond, Fredericksburg & Potomac R.R. v. Metropolitan Wash. Airports Auth.*, 251 Va. 201, 212, 468 S.E.2d 90, 96-97 (1996); *Jenkins v. County of Shenandoah*, 246 Va. 467, 470, 436 S.E.2d 607, 609 (1993); *Prendergast v. Northern Va. Reg'l Park Auth.*, 227 Va. 190, 195, 313 S.E.2d 399, 402 (1984); *Nelson Cty. v. Loving*, 126 Va. 283, 299-300, 101 S.E. 406, 411 (1919); *Nelson Cty. v. Coleman*, 126 Va. 275, 279, 101 S.E. 413, 414 (1919); *Upper Appomattox Co. v. Hardings*, 52 Va. (11 Gratt.) 1, 4 (1854).

The implied-contract explanation also reinforces the first premise of inverse condemnation law, which recognizes a remedy for a de facto taking or damaging of private property in the same way that eminent domain proceedings provide a remedy for a de jure taking or damaging. In inverse condemnation cases, the law implies the constitutional duty of compensation in circumstances where the taking or damaging of private property would be compensable under traditional eminent domain principles. For this reason, we say that an inverse condemnation claim "is not a tort action, but a contract action" based upon an implied constitutional promise of compensation. *Jenkins v. County of Shenandoah*, 246 Va. 467, 470, 436 S.E.2d 607, 609 (1993).

The limits of this implied constitutional promise are found in the express language of Article I, Section 11 of the Constitution of Virginia, from which an inverse condemnation claim arises. *See Burns*, 218 Va. at 627, 238 S.E.2d at 825 (noting that an inverse condemnation claim is "a contract action *under* Article I, Section 11 of the Constitution of Virginia" (emphasis added)). Article I, Section 11 prohibits the taking or damaging of private property "for public use without just compensation." Va. Const. art. I, § 11. The power of eminent domain can never be exercised "except for public use," and, even then, that power can only be exercised to the extent "necessary to achieve the stated public use." *Id.* The constitutional duty of just compensation thus presupposes that the taking or damaging of private property was "for public use" and done only to the extent "necessary to achieve the stated public use." *Id.*[4]

---

[4] Code § 1-219.1(A) provides an exclusive definition of "public uses" and limits the "acquisition" of private property to these specified uses. The statute, however, does not address the "damaged . . . for public use" language in Article I, Section 11 of the Constitution of Virginia. Each of the six "public uses" in the statutory definition applies to property that is "taken." *See* Code § 1-219.1(A)(i)-(vi). Nothing in the statute limits inverse condemnation liability for damage to personal property.

At one level, it is quite easy to apply this for-public-use limiting principle. Because the power of eminent domain extends only to "lawful acts" by government officials, it does not include "negligent" or other "wrongful" acts committed outside of or in violation of their delegated authority. *Eriksen v. Anderson*, 195 Va. 655, 660-61, 79 S.E.2d 597, 600 (1954).[5] "If they exceed their authority, or violate their duty, they act at their own risk, and the State is not responsible or liable therefor." *Id.* (citation omitted). What is true for eminent domain is likewise true for inverse condemnation claims. Tortious or wrongful conduct by a government official, acting outside his or her lawful authority, can never be a sufficient ground, in itself, for an inverse condemnation award.[6]

---

[5] *See also City of Va. Beach v. Oakes*, 263 Va. 510, 517, 561 S.E.2d 726, 729 (2002) (stating that "we have consistently held that the 'eminent domain provisions in the Virginia Constitution have no application to tortious or unlawful conduct'" (citation omitted)); *State Highway & Transp. Comm'r v. Lanier Farm, Inc.*, 233 Va. 506, 511, 357 S.E.2d 531, 534 (1987) (same); *Wilson v. State Highway Comm'r*, 174 Va. 82, 88-93, 4 S.E.2d 746, 749-51 (1939) (holding that a suit against the State for damages based on negligent construction of a highway was barred by sovereign immunity); *cf. Commonwealth v. Chilton Malting Co.*, 154 Va. 28, 33-37, 152 S.E. 336, 337-39 (1930) (distinguishing the implied-contract theory described in *Nelson County v. Coleman*, 126 Va. at 278-79, 101 S.E. at 414, in part because the Commonwealth "ha[d] neither taken the property of the company nor used it for its own purposes," unlike in *Coleman*, where the county took land and used it as a public road, and concluding that "this case cannot be maintained against the Commonwealth, because it is based upon a tort, and it is not true that after the alleged tort the property was converted to the use of the Commonwealth").

[6] To varying degrees, other states are in substantial agreement with this view. *See St. Francis Drainage Dist. v. Austin*, 296 S.W.2d 668, 671 (Ark. 1956) ("When all is said and done, and regardless of what this cause of action may be called, it sounds in tort."); *Tilton v. Reclamation Dist. No. 800*, 48 Cal. Rptr. 3d 366, 369-74 (Cal. Ct. App. 2006) (concluding that "garden variety inadequate maintenance . . . is not an adequate basis for an inverse condemnation claim"); *Trinity Broad. of Denver, Inc. v. City of Westminster*, 848 P.2d 916, 920-22 (Colo. 1993) ("[I]nverse condemnation, as its name suggests, is the mirror-image of eminent domain. To invoke the power of eminent domain, a governmental or public instrumentality . . . must intend to use the property taken for a proper public purpose . . . ."); *Johnson v. City of Atlanta*, 161 S.E.2d 399, 400-01 (Ga. Ct. App. 1968) ("From the facts set out in the petition no inference can be drawn that the damage to the plaintiff's house was done in order that it be used for a 'public purpose.'"); *Angelle v. State*, 34 So. 2d 321, 323-27 (La. 1948) (stating that the "public purposes" requirement of the Louisiana Constitution cannot be met by mere proof of "negligent acts or omissions"); *Electro-Jet Tool & Mfg. Co. v. City of Albuquerque*, 845 P.2d 770, 774-80

At nearly all other levels, however, the for-public-use limiting principle can be quite difficult to apply. No "magic formula" addresses the multitude of fact patterns that can arise, and, truth be told, there are "few invariable rules in this area." *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, ___, 133 S. Ct. 511, 518 (2012). Several of our cases nonetheless provide a useful framework for understanding the factual scenarios that satisfy this limitation on inverse condemnation claims.

In *Jenkins*, we considered a county water-drainage easement that crossed two lots in a residential subdivision. On the easement, the lot owners alleged, the county had dug an improperly designed drainage ditch and failed to maintain it. On a regular basis, the ditch flooded the lots because it was "incapable of conveying concentrated storm water." *Jenkins*, 246 Va. at 469, 436 S.E.2d at 609. We addressed the only for-public-use question before us: whether there was "evidence" that the drainage ditch (situated on an easement dedicated to the county by a subdivision developer) "was part of a water discharge system which served to divert water" from developed land onto the plaintiffs' property. *Id.* at 470, 436 S.E.2d at 609. We held that there was such evidence. *See id.*

---

(N.M. 1992) (stating that "the owner must allege and prove at least the kind of deliberate taking of a calculated risk described above, so that the damage can meaningfully be said to have occurred 'for' (*i.e.*, in order to accomplish) a public use"); *Vokoun v. City of Lake Oswego*, 56 P.3d 396, 401-02 (Or. 2002) (holding that "a claim for inverse condemnation requires . . . intent to take the property for a public use"); *Gearin v. Marion Cty.*, 223 P. 929, 933 (Or. 1924) ("There was no intention upon the part of the county to subject the property or any part thereof to a public use . . . ."); *City of San Antonio v. Pollock*, 284 S.W.3d 809, 820-21 (Tex. 2009) ("An accidental destruction of property does not benefit the public. The public-use limitation 'is the factor which distinguishes a negligence action from one under the constitution for destruction.'" (citation omitted)); *Chavez v. City of Laramie*, 389 P.2d 23, 24-25 (Wyo. 1964) ("Where the injury involves a tort, being caused by the negligence of public officers or their agents, it cannot be said that property is taken or damaged for public use.").

9

We did not hold that the flooding damage triggered inverse condemnation liability simply because the ditch was a component of the county's water-discharge system. Instead, we pointed out that the alleged purpose and function of the ditch — which was located on the plaintiffs' property — was "to divert water from approximately 36 acres of developed land onto their property," and it was flooding from that very diversion that damaged the plaintiffs' lots. *Id.* It did not matter that the original design of the ditch or its later disrepair was negligent under traditional tort principles. *See id.* An inverse condemnation action, we reaffirmed, "is not a tort action, but a contract action" under Article I, Section 11 of the Constitution of Virginia. *Id.*

We considered a similar scenario in *Hampton Roads Sanitation District v. McDonnell*, 234 Va. 235, 360 S.E.2d 841 (1987). There, a pump station operated by a sanitation district handled overload conditions by opening a "bypass valve" that "divert[ed] the overflow from the pump station and discharge[ed] the wastewater upon [the plaintiff's] property." *McDonnell*, 234 Va. at 237, 360 S.E.2d at 842. "The undisputed evidence," we observed, proved that the sanitation district "intentionally discharged sewage" onto the plaintiff's property by designing the bypass valve to "permit such discharge when the flow became excessive." *Id.* at 238-39, 360 S.E.2d at 843. These facts established that the pump station damaged private property "for public uses" under Article I, Section 11 of the Constitution of Virginia. *Id.*

In a more recent case, *Kitchen v. City of Newport News*, we held that an inverse condemnation claim could proceed to trial based on allegations that a municipality had caused residential subdivisions to serve as "contingent retention or detention pond areas" for water overflowing a nearby creek and pond. 275 Va. 378, 387-89, 657 S.E.2d 132, 137-38 (2008). These factual allegations supported the landowner's claim that the municipality flooded his

property "for public use" because, whether expressly or implicitly, the municipality chose to use the subdivisions as contingent overflow areas for the municipal water-discharge system. *Id.*

Our most recent case addressing the for-public-use requirement is *Livingston v. Virginia Department of Transportation*, 284 Va. 140, 726 S.E.2d 264 (2012). Like *Jenkins* and *Kitchen*, *Livingston* involved flooding. Various homeowners claimed that the Virginia Department of Transportation (VDOT) redesigned an existing water-discharge system serving an area in Fairfax County. The redesign included relocating a tributary of the Potomac River, narrowing the natural width of the tributary by 62%, filling in portions of watershed marshes to construct a highway, and building the highway "in such a way," allegedly, "as to serve as a concrete wall blocking any northern flow of water from the channel." *Livingston*, 284 Va. at 146, 726 S.E.2d at 268. Subsequent failure to maintain the tributary, along with other highway construction and commercial development, the homeowners claimed, only created worse conditions. *See id.* at 146-47, 726 S.E.2d at 268.

During a heavy storm, the redesigned system blocked northern water flow and sent stormwater south, overwhelming the tributary and causing the sewage water to back up through sewers and flood basements. *See id.* at 145-46, 726 S.E.2d at 267. The homeowners filed an inverse condemnation claim against VDOT arguing that the redesigned system damaged their property "for public use." *Id.* at 148, 726 S.E.2d at 268-69. In response, VDOT argued that the for-public-use requirement could be satisfied only when government "engages in an affirmative and purposeful act that devotes private property . . . to public use." *Id.* at 157, 726 S.E.2d at 274 (alteration omitted).

We rejected VDOT's application of the for-public-use requirement to the facts of that case. Article I, Section II applies to purposeful acts as well as purposeful failures to act. "In

11

essence," we read the allegations of the *Livingston* complaint to imply that "VDOT *elected to use* the [newly constructed highway] and nearby residential developments as *makeshift storage sites for excess stormwater*" instead of maintaining the relocated tributary that earlier diverted excess water into the Potomac River. *Id.* at 159, 726 S.E.2d at 275 (emphases added). This purposeful and uncompensated "public use" of private property as a makeshift storage site was exactly the "type of mischief that Article I, Section 11 was adopted more than 100 years ago to remedy." *Id.* at 160, 726 S.E.2d at 275-76. "We thus conclude[d] that the Plaintiffs ha[d] sufficiently alleged that their homes were damaged for public use under Article 1, Section 11 to withstand demurrer." *Id.* at 160, 726 S.E.2d at 276.

The common thread in each of these cases is that the purposeful act or omission causing the taking of, or damage to, private property was for a public use. In *Jenkins* and *Kitchen*, governmental authorities used private property as flooding sites to handle expected overflows from the public stormwater system. In *McDonnell*, the damage to private property was for a public use because a bypass valve, operating as designed, poured excess sewage onto an adjacent landowner's property. In *Livingston*, VDOT "elected to use" nearby residential developments as "makeshift storage sites for excess stormwater." 284 Va. at 159, 726 S.E.2d at 275.

In none of these scenarios was private property taken or damaged through the mere negligence of a governmental actor incident to, or while participating in, a public function. Rather, in these cases, the government "asked private property owners . . . to bear the cost of a public improvement." *Id.* at 160, 726 S.E.2d at 275. This element distinguishes an inverse condemnation claim from a mere tort claim alleging negligence, nuisance, trespass, or other common-law theories of recovery. None of those claims require any showing that the damage resulted from a purposeful act or omission seeking to advance the "public welfare," *id.*, in a

12

manner that satisfies the for-public-use requirement of Article I, Section 11 of the Constitution of Virginia.[7]

3.

Judged against these principles, the insurers' original complaint did not allege a legally viable inverse condemnation claim against the County. The complaint asserted that the County's sewage treatment plant and underground sewer lines existed "for the public purpose of supplying Arlington County with water and sewage disposal services." J.A. at 3. From that premise, the insurers alleged several ways in which the County failed "to properly maintain and operate the sewage treatment plant." *Id.* These failures, the insurers concluded, "resulted in a taking and/or damaging of the private property of Harris Teeter, without just compensation, in violation of Article I, § 11." *Id.* at 5.

These allegations simply proved too much, and thus, proved nothing. They presupposed that inverse condemnation principles can provide a remedy for property damage of any nature, whether intentional, negligent, or wholly innocent, caused by a governmental entity. If that were true, of course, sovereign immunity would no longer exist in the Commonwealth of Virginia for

---

[7] We do not mean to imply that negligence allegations without fail defeat an otherwise valid inverse condemnation claim that satisfies the for-public-use requirement. Mere negligence is insufficient, as one court has aptly explained, but

> [t]hat is not to say that the later characterization of a public agency's deliberate action as negligence automatically removes the action from the scope of the constitutional requirement for just compensation. So long as the entity has made the deliberate calculated decision to proceed with a course of conduct, in spite of a known risk, just compensation will be owed. . . . [T]o prove the type of governmental conduct that will support liability in inverse condemnation it is enough to show that the entity was aware of the risk posed by its public improvement and deliberately chose a course of action — or inaction — in the face of that known risk.

*Arreola v. County of Monterey*, 122 Cal. Rptr. 2d 38, 53-55 (Cal. Ct. App. 2002).

13

property damage claims.[8]  Nearly every function that a government and its agents perform (e.g.,

building roads, driving police vehicles, maintaining traffic signals, operating school buses,

deploying snow plows, and constructing bridges) can, and sometimes does, damage private

property.

One may fairly ask why government should not be liable in tort to the same extent a

private person would be.  But that question — predicated on a recurrent policy objection to

sovereign immunity generally — is not the issue before us.  As we have emphasized, "the

doctrine of sovereign immunity is 'alive and well' in Virginia," and "the complexity that exists

in the law of sovereign immunity cannot be eliminated by the simple expedient of doing away

with the doctrine by judicial fiat."  *Messina v. Burden*, 228 Va. 301, 307, 321 S.E.2d 657, 660

(1984).[9]  Instead, we address a much narrower question here:  What are the outer limits of the

---

[8] In a different context, we made much the same point:

> [W]e do not agree with the contention that the function of the
> "damage" clause of Article I, Section 11 is to waive sovereign
> immunity for the Commonwealth and its proxies in order to subject
> them to liability as private parties for *any* damage asserted by a
> property owner that might conceivably arise from a public use of
> land adjoining or proximate to the property allegedly damaged.

*Byler v. Virginia Elec. & Power Co.*, 284 Va. 501, 508, 731 S.E.2d 916, 920 (2012) (emphasis in original).

[9] The General Assembly, not the courts, wholly occupies this field of law.  As we have consistently said, "the State is immune from liability for the tortious acts of its servants, agents and employees, in the absence of express constitutional or statutory provisions making it liable." *Eriksen*, 195 Va. at 657, 79 S.E.2d at 598.  The General Assembly has employed an incremental approach by enacting a limited waiver of immunity in the Virginia Tort Claims Act.  *See* Code § 8.01-195.3.  The General Assembly has also addressed the scope of sovereign immunity in a host of other claim-specific statutes, generally granting and maintaining sovereign immunity for the Commonwealth and its entities except for bad-faith conduct, gross negligence, or willful misconduct, and often expressly disclaiming any intent to modify or abrogate sovereign immunity.  *See, e.g.*, Code §§ 2.2-515.2(F)(2), 5.1-173(B), 8.01-187, 8.01-192, 8.01-216.8, 15.2-970, 15.2-1809, 15.2-6603, 15.2-6629, 15.2-7403, 21-167, 21-247, 22.1-194, 33.2-1103, 38.2-229(B), 38.2-1321.1(A), 38.2-2711(A), 38.2-2814, 38.2-2913, 38.2-5511, 38.2-6015, 44-

waiver of sovereign immunity for an inverse condemnation claim under Article I, Section 11 of the Constitution of Virginia?  We have never interpreted that constitutional provision as an omnibus waiver of sovereign immunity for tort actions.  Instead, we examine carefully the specific allegations of the claim to determine whether it satisfies the constitutional for-public-use prerequisite.

The original complaint did not satisfy this prerequisite.  Nothing in it expressly alleged or reasonably implied that the County purposefully damaged the Harris Teeter grocery store *for* a public use.  No allegation suggested that the County planned or designed its system to allow the backflow in an effort to keep the entire county sewer system operating for all other users.[10] Simply alleging that damage occurred *incident to* the operation of the public sewage system is insufficient to state a claim for inverse condemnation under Article I, Section 11 of the Constitution of Virginia.

As many courts have recognized, absent evidence satisfying the for-public-use requirement, "[i]t has been definitely held that a property owner may not recover in an inverse condemnation proceeding for damages caused by acts of carelessness or neglect on the part of a public agency." *Tilton v. Reclamation Dist. No. 800*, 48 Cal. Rptr. 3d 366, 369-74 & n.4 (Cal. Ct. App. 2006) (quoting *Hayashi v. Alameda Cty. Flood Control & Water Conserv. Dist.*, 334 P.2d 1048, 1053 (Cal. Ct. App. 1959)); *see supra* notes 5-6 and accompanying text.  *See generally* 9 Thompson on Real Property § 80.05(b)(2), at 365-66 (David A. Thomas ed., 3d Thomas ed. 2011) ("[E]ven though inverse condemnation is raised in some actions where the

146.28:1, 44-146.36(B), 46.2-203.2(E), 46.2-342(L), 52-41, 52-49, 54.1-2516(A), 54.1-2818.1, 54.1-3038, 60.2-114.01(E), 62.1-44.24(1), 63.2-1902, 65.2-1006(A)(2).

[10] At oral argument on appeal, the insurers conceded this point.  *See* Oral Argument Audio at 14:18 to 15:31.

'taking' is inadvertent or negligent, inverse condemnation is not appropriate to avoid sovereign immunity in a true tort action against the government." (footnote omitted)).[11] Our precedent is in full accord with this prevailing view. We thus agree with the circuit court that the insurers' original complaint failed to state a claim.

4.

After the circuit court granted the County's demurrer, the insurers sought to remedy their sparse initial pleading by asking for leave to file a proffered amended complaint. Most of the amplified allegations in the proffered amended complaint merely add detail to the charge that the County negligently failed to maintain and operate its sewer system in a competent manner. Like the circuit court, we find no legal significance in the added specificity of these negligence allegations.

That said, several allegations in the amended complaint assert or at least imply that the County purposefully took or failed to take certain actions that, when combined, intentionally caused the sewer line at Harris Teeter to back up *so that* the entire system could continue to operate. Prior to the backup at Harris Teeter, the insurers allege, "the County *purposefully*

---

[11] *See also* A.W. Gans, Annotation, *Damage to Private Property Caused by Negligence of Governmental Agents as "Taking," "Damage," or "Use," for Public Purposes, in Constitutional Sense*, 2 A.L.R.2d 677, §§ 2, 6(a) (2017) ("Not all cases involving negligent planning, construction, etc., of public projects have resulted in recovery for one seeking damages under the eminent domain theory. Recovery has consistently been denied where sought to be based on activities negligently engaged in or carried on which were the mere performance of some public function or duty, but were unrelated to a deliberate taking or damaging of private property, constituting mere tortious acts which were not the necessary consequence or result of some public undertaking or project. . . . Circumvention of immunity from tort liability for negligence of governmental bodies . . . has been repeatedly refused where the activities negligently engaged in or carried on were the mere performance of some public function or duty unrelated to a deliberate taking or necessary damaging of private property, and constituted mere tortious acts, not the necessary consequence or result of some public undertaking or project." (collecting cases)).

16

diverted sewage and/or storm water from another County treatment facility or pump station that it had closed" yet never increased the capacity of the plant or followed the recommendations of engineers for other changes "even though in doing so *it knew* that a sewage back-flow onto the property of others *would occur*." J.A. at 153-54 (emphases added).

The insurers also allege that the County adopted "policies, procedures and practices" that "made it *most probable* that a sewage backup would occur." *Id.* (emphasis added). A reasonable inference from these allegations appears to be that the County was willing to incur the "most probable" risk of damaging the Harris Teeter property to keep the sewer system operational for all other users. *See id.* at 153-55. The County allegedly did so to compensate for its underfunded and poorly managed maintenance program. *See id.*

If the insurers could prove that the policies, procedures, and practices of the County consisted of a plan or design to use the Harris Teeter property in this manner, they may have an inverse condemnation claim. Despite these new allegations, the circuit court denied the motion for leave to amend and dismissed the case with prejudice. While we acknowledge the circuit court's apparent skepticism of these allegations, the court should nonetheless have permitted the amendment.

"On appeal, review of the trial court's decision to grant or deny a motion to amend is limited to the question whether the trial judge abused his discretion." *Lucas v. Woody*, 287 Va. 354, 363, 756 S.E.2d 447, 451 (2014) (citation omitted). After sustaining a demurrer, a court should grant a motion for leave to amend except when, for example, the proffered amendments are legally futile, when the amendment is untimely under an order granting leave to amend by a certain deadline or fails to satisfy other conditions in the scheduling order, when there is no proffer or description of the new allegations, when amendment would be unduly prejudicial to

the responding party, or when the amending party has engaged in improper litigation tactics. *See* Rule 1:8; *Mortarino v. Consultant Eng'g Servs., Inc.*, 251 Va. 289, 295-96, 467 S.E.2d 778, 782-83 (1996) (relying primarily on the lack of prejudice to find that the trial court abused its discretion in denying leave to amend); *Kole v. City of Chesapeake*, 247 Va. 51, 57, 439 S.E.2d 405, 409 (1994) (relying exclusively on the absence of prejudice). *See generally* Kent Sinclair & Leigh B. Middleditch, Jr., Virginia Civil Procedure § 11.2[B], at 813-19 (6th ed. 2014 & Supp. 2016-2017); 1 Friend & Sinclair, *supra* note 1, § 6.07[1], at 6-15 to -17.

In this case, the County makes no argument that the insurers' amended complaint was either untimely or prejudicial. It contends only that the circuit court properly denied leave to amend because the amended complaint fails to cure the shortcomings of the original complaint, and amendment was thus legally futile. *See* Appellee's Br. at 16-17; *see, e.g.*, *Hechler Chevrolet, Inc. v. General Motors Corp.*, 230 Va. 396, 403-04, 337 S.E.2d 744, 748-49 (1985). The circuit court agreed with this view. We do not. The amended allegations and the reasonable inferences from them support a viable legal theory of recovery, and thus, the circuit court abused its discretion in denying the motion for leave to amend. *See, e.g.*, *Mortarino*, 251 Va. at 295-96, 467 S.E.2d at 782-83 (finding that the trial court did not err in sustaining a demurrer but reversing denial of leave to amend the defective pleading).[12]

## B. DAMAGE TO PERSONAL PROPERTY

Harris Teeter leased the real property on which it maintained its grocery store. The

---

[12] There are occasions when the proffered amendments raise matters outside the arguments and briefing of the earlier demurrer. When this occurs, a circuit court need not make a dispositive finding that the amended complaint states a legally viable claim before granting leave to amend. It is sufficient, under those circumstances, to observe that amendment would not prejudice the responding parties. *See* Rule 1:8; *see, e.g.*, *Mortarino*, 251 Va. at 295-96, 467 S.E.2d at 782-83; *Kole*, 247 Va. at 57, 439 S.E.2d at 409.

sewage backup allegedly caused $1.8 million in damages, consisting of the loss of grocery stock and the costs of removing the damaged goods and cleaning the store.[13] The subrogated insurers make no claim for damages on behalf of the owner of the real property. As an alternative basis for affirming the circuit court's dismissal, the County argues that the insurers cannot recover for damage to personal property not qualifying as fixtures. We reject that argument as inconsistent with the history and text of Article I, Section 11 of the Constitution of Virginia and its implicit constitutional claim for inverse condemnation.

1.

Because an inverse condemnation claim arises from the "self-executing" character of Article I, Section 11, that provision necessarily informs the scope of such claims. *See Burns*, 218 Va. at 627, 238 S.E.2d at 825. When interpreting a constitutional provision — no less than a statute, regulation, contract, or will — we begin with its text, which here states: "No private property shall be damaged or taken for public use without just compensation to the owner thereof." Va. Const. art. I, § 11.

Nothing in the denotation of "private property" excludes personal property — which, by definition, is simply a subset of private property. The original text of what would later become Article I, Section 11 of the Constitution of Virginia, which was introduced in 1830, forbade any law "whereby private property shall be taken for public uses, without just compensation." Va. Const. art. III, § 11 (1830); *see* John Dinan, The Virginia State Constitution 67 (2d ed. 2014). This language tracked nearly verbatim the Takings Clause of the Fifth Amendment to the United

---

[13] At oral argument on appeal, the insurers suggested that Harris Teeter suffered damage to its real property in addition to its merchandise, including damage to its flooring, shelving, coolers, and freezers. *See* Oral Argument Audio at 1:08 to 1:31. They conceded, however, that the only damages that they seek in this action are for the lost merchandise and the cost of removing it and cleaning up the store. *See id.* at 1:31 to 2:02.

States Constitution, which declares, "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V.

There has never been any serious debate as to whether the Takings Clause of the Fifth Amendment applies to personal property. As the United States Supreme Court recently reiterated, "[n]othing in the text or history of the Takings Clause, or our precedents, suggests that the [just-compensation requirement] is any different when it comes to appropriation of personal property." *Horne v. Department of Agric.*, ___ U.S. ___, ___, 135 S. Ct. 2419, 2425-28 (2015). It may be "rare for American governments to requisition personal property, but sometimes they do so and when they do they have to pay just compensation." *Warner/Elektra/Atlantic Corp. v. County of DuPage*, 991 F.2d 1280, 1285 (7th Cir. 1993) (collecting cases).[14]

We find it equally clear that "private property" under Article I, Section 11 of the Constitution of Virginia applies to personal property. For as long as the power of eminent domain has existed, so too have the limitations on this power applied to confiscation of personal property. The barons at Runnymede demanded just compensation for personal property. *See* Magna Carta, *supra*, at ch. 28 (requiring compensation for the taking of "corn or other goods"). Blackstone similarly viewed eminent domain principles fully applicable to personal property. *See* 1 Blackstone, *supra* note 2, at *138-39 (declaring that "no man's land *or goods*" could be seized in violation of "the great charter, and the law of the land" (emphasis added)); *see also* 5 Edw. 3 c. 9 ("That no Man from henceforth shall . . . [have his] *Goods, nor Chattels* seised into the King's Hands, against the Form of the Great Charter, and the Law of the Land." (emphasis

---

[14] *See also Superior Coal & Builders Supply Co. v. Board of Educ.*, 83 S.W.2d 875, 876 (Ky. 1935) ("[N]or does it make any difference that a portion of the plaintiff's property was personal property, as [the just-compensation provisions of the Kentucky Constitution] apply to both real and personal property.").

added)).  And St. George Tucker concluded that the seizure of personal property was the probable reason for the adoption of the federal Takings Clause.  *See* 4 Tucker, Ten Notebooks, *supra*, at 147 (stating that the Takings Clause "was probably intended to restrain the arbitrary & oppressive measure of obtaining *supplies* by impress[ment] as was practiced during the last war, not infrequently without any Compensation whatsoever" (emphasis added)); *see also* 1 Tucker, Blackstone's Commentaries, *supra*, Editor's App. Note D, at 305-06 (same).

Consistent with this view, the General Assembly defines property for eminent domain purposes to include "land and personal property, and any right, title, interest, estate or claim in or to such property."  Code § 25.1-100.  While this definition does not directly address inverse condemnation claims, it has the indirect effect of doing so because such claims presuppose a constitutionally "implied contract" arising out of a de facto use of the eminent domain power, *Nelson Cty. v. Coleman*, 126 Va. 275, 279, 101 S.E. 413, 414 (1919), and are thus claims "*under* Article I, Section 11 of the Constitution of Virginia."  *Burns*, 218 Va. at 627, 238 S.E.2d at 825 (emphasis added); *see supra* at 6-8.

In short, Article I, Section 11 makes no categorical distinction between personal and real property.  The implied constitutional right of action for inverse condemnation likewise contains no such distinction.  If such a claim meets all of the necessary requirements to recover for a taking or damaging of private property, it is no defense that the property taken or damaged was personal and not real property.  *See* 1 A.E. Dick Howard, Commentaries on the Constitution of Virginia 226 (1974) (observing that "personal property taken or damaged" is an interest "subject to just compensation" principles).

2.

The County does not directly challenge the historical basis of our reasoning, but instead

21

asserts that our precedent has departed from it. As the County reads our prior cases, we have adopted a per se rule that damage to personal property is only recoverable if the personal property has been transmuted into real property under the law of fixtures. We read our case law differently.

Our line of precedent on this issue began with *City of Richmond v. Williams*, 114 Va. 698, 77 S.E. 492 (1913). There, a municipality condemned land on which a lessee stored lumber. We held, under the then-current version of the eminent domain statute that required condemnation commissioners to ascertain "just compensation for the land *or other property proposed to be condemned*," that it was proper to award the lessee compensation for the costs of removing the lumber and for the loss of the "foundation timbers on which the lumber was piled." *Williams*, 114 Va. at 699-703, 77 S.E. at 492-94 (emphasis added).

Neither the lumber piles nor the foundation timbers were fixtures, yet *Williams* concluded that "we can only satisfy the language of the [eminent domain] statute by construing the language used as embracing personal property." *Id.* at 702, 77 S.E. at 494 (citing former Code § 1105f(5)). This statutory language, we emphasized, was enacted "in obedience to" the Eminent Domain Clause of the Virginia Constitution, *id.* at 701, 77 S.E. at 493, and required an award that constitutes "a full equivalent for the damages to the land *or other property injured*, as well as for that which is taken," *id.* at 703, 77 S.E. at 494 (emphasis added). *Cf. Coleman*, 126 Va. at 278, 101 S.E. at 414 (recognizing that the "implied contract" theory of inverse condemnation stems from the general rule that a plaintiff can waive a tort action and sue upon an implied contract "where a tort is committed which involves an injury to *personal property*" (emphasis added)).

In another such case, *Town of Cape Charles v. Ballard Bros. Fish*, 200 Va. 667, 107 S.E.2d 436 (1959), a town filed an eminent domain proceeding to condemn an easement to dredge a deep water channel through a creek. The trial court's instructions to the eminent domain commissioners tasked with assessing just compensation "in effect excluded from consideration the value of the oysters and the oyster beds that would be taken or destroyed by the dredging operation." *Ballard Bros.*, 200 Va. at 673, 107 S.E.2d at 440. Relying on *Williams*, we held that the oysters were the "personal property" of the lessee "and if taken or damaged in eminent domain proceedings, just compensation must be rendered therefor." *Id.* We did not condition the holding in *Ballard Bros.*, as the County infers that we did, *see* Appellee's Br. at 11, on the view that the oysters were fixtures appurtenant to real property. That assertion, whether true or not, had no impact on our holding.[15]

The County, however, draws our attention to a separate line of cases in support of its argument that only fixtures appurtenant to real property can be included in a damage award. We do not read these cases so broadly.

In *Potomac Electric Power Co. v. Fugate*, two power companies sought a declaratory judgment that the State Highway Commissioner was "required to reimburse [them] for the costs" of relocating their "utility facilities" that they were required to move when the Commissioner acquired the land on which the facilities were located.[16] 211 Va. 745, 746, 180 S.E.2d 657, 657 (1971). The prior condemnation proceeding did not take or damage the utility facilities. The

---

[15] Our observation that "it would not be practicable to take up and replant these oysters" was only relevant to our conclusion that the duty of a property owner to minimize the damages that he sustains from a taking was inapplicable because the property owner "is not bound to enter upon a doubtful and speculative undertaking." *Ballard Bros.*, 200 Va. at 673, 107 S.E.2d at 440.

[16] The power company also asserted implied rights of action under various statutory provisions, which we also rejected, but that discussion has no relevance here.

23

only issue, then, was whether the power companies were required to bear the costs of moving their own facilities. We held that they were.

The power companies in *Fugate* had no property right to place their facilities at that particular location. There was no easement or lease granting such a right. They were located there pursuant to "mere licenses, revocable at will," and, under common law, the utility bore "the burden of relocating facilities at its own cost" under such circumstances. *Id.* at 747-48, 180 S.E.2d at 658-59. The condemnation proceeding, therefore, took no property rights of any nature from the power companies. The only thing the power companies lost was the right to use a license that was revocable at will, and thus, there was no "damage in the constitutional sense." *Id.* at 749-50, 180 S.E.2d at 660.

The irony of *Fugate*, at least in the manner that the County uses it, is that we specifically distinguished the situation in that case from the one here — an inverse condemnation claim by a lessee for damage to personal property:

> What has been said distinguishes the cases of *Town of Cape Charles* v. *Fish Co.*, 200 Va. 667, 107 S.E.2d 436 (1959), and *Richmond* v. *Williams*, 114 Va. 698, 77 S.E. 492 (1913), relied upon by the plaintiffs. In each of those cases, the *personal property damaged* or required to be removed by public undertaking was in place under a *leasehold right*. Thus, as incidental to the damaging of a property right, *i.e.*, the leasehold interest, compensation for the costs of relocating the personal property was constitutionally required.

*Id.* at 750, 180 S.E.2d at 660 (emphases added).[17]

---

[17] Although the insurers do not seek compensation for the injury that Harris Teeter sustained to its leasehold interest (i.e., for the damage to the real property itself), the damage to the personal property did come as a result of, or "incident to," the flooding of the real property with raw sewage. *See* Black's Law Dictionary 879 (10th ed. 2014) (defining "incident" as "Dependent on, subordinate to, arising out of, or otherwise connected with (something else, usu[ally] of greater importance)"). Moreover, as was the case in *Fugate*, Harris Teeter's personal property was in place pursuant to a lease agreement.

The County also relies upon *Taco Bell of America, Inc. v. Commonwealth Transportation Commissioner of Virginia*, 282 Va. 127, 710 S.E.2d 478 (2011). In that case, the Transportation Commissioner condemned a Taco Bell restaurant and surrounding land for a highway project. The issue in the case was narrow: whether the condemnation award should pay for various pieces of equipment in the restaurant, including ovens, refrigerators, freezers, sinks, and other similar items. Implicit in the Commissioner's argument was that he had no interest in taking these items and did not, in fact, actually take any of them. Under the Commissioner's view, Taco Bell should have simply packed up those items and moved them out of the condemned property.

The trial court agreed with the Commissioner and struck Taco Bell's evidence on this issue. We reversed. In our view, Taco Bell had presented enough evidence that these items were fixtures, and thus part of the real property that the Commissioner had taken, in order to survive a motion to strike and submit the question to the jury. *See Taco Bell*, 282 Va. at 133, 710 S.E.2d at 482. We never once suggested, as the County seems to infer, that Taco Bell would not have had a valid claim if the Commissioner had actually taken equipment that had never become fixtures annexed to the realty. Answering that question was not at all the point of our decision in *Taco Bell*.[18]

---

[18] Notably, *Taco Bell* did not involve a lessee claimant. Taco Bell was the owner of the restaurant, the land underneath it, and the equipment within it. In a dispute with a condemning authority, we treat lessees differently than fee simple owners and find that "as between the condemnor and lessee, structures attached to the condemned real estate but owned by the lessee are realty . . . even though, as between the landlord and lessee, the structures may be personalty." *Lamar Corp. v. City of Richmond*, 241 Va. 346, 351, 402 S.E.2d 31, 34 (1991); *see also Lamar Corp. v. Commonwealth Transp. Comm'r*, 262 Va. 375, 382, 552 S.E.2d 61, 64 (2001); *Exxon Corp. v. M & Q Holding Corp.*, 221 Va. 274, 281, 269 S.E.2d 371, 376 (1980); *Norfolk S. Ry. v. American Oil Co.*, 214 Va. 194, 199-200, 198 S.E.2d 607, 611 (1973); *Foodtown, Inc. v. State Highway Comm'r*, 213 Va. 760, 763-64, 195 S.E.2d 883, 886 (1973).

Finally, the County turns to *Livingston*, our most recent pronouncement on these issues. Our opinion in *Livingston*, the County contends, adopted a per se rule that an inverse condemnation claimant cannot recover for damages to personal property that does not constitute a fixture appurtenant to real property. In fairness, we must acknowledge that a single sentence of our opinion, *see Livingston*, 284 Va. at 161, 726 S.E.2d at 276 ("We stress, however, that the Plaintiffs can only recover for damage to personal property that was appurtenant to their homes; for Article I, Section 11's primary focus is the taking and damaging of real property"), provides some conceptual scaffolding for such a claim. But that statement is far too weak to support the weight of the County's argument.

In *Livingston*, the debate over recovery for damages to personal property centered on VDOT's argument that, because it lacked specific statutory authorization to condemn personal property, it could not as a matter of law be liable in inverse condemnation for taking or damaging personal property. Our entire analysis, save one sentence, responded solely to VDOT's specific argument. "We reject[ed] VDOT's contention" because nothing in our precedent prohibited inverse condemnation liability for personal property not included within the condemning authority's grant of eminent domain power and because *Williams* and *Fugate* supported recovery for personal property. *See id.* at 160-61, 726 S.E.2d at 276.[19] This single-sentence, "appurtenant to" qualification alluded to, but did not mention, any factors relevant to fixtures. The parties' briefs in *Livingston* similarly failed to address the law of fixtures in any detail. Nor did our opinion or the parties' briefs cite any supporting authority that might illuminate the precise meaning of this caveat.

---

[19] Neither the County nor the insurers ask that we reconsider *Livingston* or any aspect of its holding.

26

While often used interchangeably, "appurtenances" and "fixtures" are not identical synonyms in the lexicon of law. All fixtures are appurtenances, but not all appurtenances are fixtures. A fixture is but one kind of appurtenance. For example, an above-ground hot tub may or may not be an appurtenant fixture, but a custom built, in-ground swimming pool could be considered an appurtenance but not a fixture. We thus find it implausible that the ambiguous "appurtenant to" sentence in *Livingston* was meant to overrule *Williams* and *Fugate* and thereby establish a per se rule under Virginia law that inverse condemnation liability can never extend to personal property that does not become transformed into realty under fixture principles.[20]

Our reluctance to adopt such a per se rule is confirmed by *Livingston*'s earlier citation with approval of *Williams* and *Fugate*. *See Livingston*, 284 Va. at 161, 726 S.E.2d at 276. If the County's interpretation had been the true ruling of *Livingston*, we would have just as well have said that Article 1, Section 11 of the Constitution of Virginia applies only to real property because that is what personal property essentially becomes when it constitutes a fixture. *See, e.g.*, *State Highway & Transp. Comm'r v. Edwards Co.*, 220 Va. 90, 94, 255 S.E.2d 500, 503 (1979) (observing that the fixture test determines "whether an item of personal property upon realty *itself becomes realty*" (emphasis added)).[21] As observed earlier, no Virginia precedent has

---

[20] Instead, the enigmatic sentence in *Livingston* should be contextualized by the specific facts and arguments made by the parties. The first clause of the sentence references "Plaintiffs" as the subject and appurtenances to "their homes" as its predicate object. *Livingston*, 284 Va. at 161, 726 S.E.2d at 276. The second clause of the sentence adds only that the "primary focus" of Article I, Section 11 of the Constitution of Virginia — rather than its *exclusive* focus — is the taking of, or damage to, real property. *Id.* Read together, these statements suggest a case-specific observation focusing, perhaps, on principles of remoteness, proximate cause, and foreseeability under the unique facts of that dispute.

[21] *See also Clayton v. Lienhard*, 167 A. 321, 322 (Pa. 1933) (defining fixtures as items of personal property that, in law, are deemed "realty"); 2 Thompson, *supra*, § 13.02(b), at 347 (David A. Thomas ed., 3d Thomas ed. 2014 & Supp. 2016) ("Items of personal property that become affixed or annexed to real property, but retain their separate identity, generally are known as fixtures, and are *considered real property by definition . . . .*" (emphasis added)).

ever established such an ahistorical rule, *see supra* at 21-27, and we do not recognize it today.

3.

For these reasons, we hold that the prohibition against taking or damaging "private property . . . except for public use," Va. Const. art. I, § 11, applies to personal property. Whether the personal property has been transformed into real property under fixture law is irrelevant. As Chief Justice Roberts succinctly stated: "The Government has a categorical duty to pay just compensation when it takes your car, just as when it takes your home." *Horne*, ___ U.S. at ___, 135 S. Ct. at 2426. We see no reason why the same duty should not apply to a grocer's stock.

III.

In sum, the circuit court correctly sustained the County's demurrer to the insurers' original complaint because its allegations did not state a viable legal claim for inverse condemnation. The court erred, however, in denying the insurers leave to amend their complaint. The allegations in the proffered amended complaint, coupled with the reasonable inferences arising from them, assert a prima facie case of inverse condemnation.

We thus affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

*Affirmed in part,*<br>*reversed in part,*<br>*and remanded.*